**COLUMBIA MEDICAL CENTER OF LAS COLINAS d/b/a Las Colinas Medical Center and Lisa Crain, R.N., Appellants,**

v.

**Norma BUSH, As Next Friend and As Guardian of Scott BUSH, Appellee.**

**No. 2–02–331–CV.**

Court of Appeals of Texas, Fort Worth.

Nov. 20, 2003.

---

Cooper & Scully, P.C., R. Brent Cooper, Diana L. Faust, Michelle E. Robberson, Devon J. Fultz, Dallas, for appellants.

Hill Gilstrap, P.C., Frank Gilstrap, Arlington, Law Office of Steven C. Laird, Steven C. Laird, Fort Worth, for appellee.

PANEL B: LIVINGSTON and WALKER, JJ.; and SAM J. DAY, J. (Retired, Sitting by Assignment).

## OPINION

SUE WALKER, Justice.

### I. Introduction

Appellants Columbia Medical Center of Las Colinas d/b/a Las Colinas Medical Center and Lisa Crain, R.N. appeal the judgment rendered against them and in favor of Scott Bush following a fourteen-day jury trial. Appellants raise four issues[1] challenging the legal and factual sufficiency of the evidence to support various jury findings, one jury charge issue based on *Casteel*,[2] one issue complaining of allegedly conflicting jury findings, one issue claiming the Medical Center was entitled to an offset from Scott's past medical expenses, and one issue complaining of improper jury argument. We will affirm the trial court's judgment.

### II. Background Facts

Scott, a forty-six-year-old optometrist, suffered from ventricular tachycardia, or rapid heartbeat. Scott's doctor diagnosed him with this condition in 1998 and prescribed Tambocor, a drug to depress the electrical activity of Scott's heart. On January 19, 2000, Scott's heart "started feeling funny." He took a Tambocor tablet and tried to relax. When his heartbeat did not return to normal, at around 11:00 p.m., a friend took Scott to the emergency room at Las Colinas Medical Center.

Nurse Crain, an emergency room nurse at the Medical Center, took Scott's initial information. Scott told Nurse Crain that he was suffering from ventricular tachycardia. He explained that although he had taken Tambocor earlier that evening, his heartbeat would not return to normal. Nurse Crain wrote this information on the emergency room intake form. Emergency

---

1. Appellants' issues are extremely long and multifarious. They are especially confusing because they are not restated within the body of Appellants' brief, and in some instances, we cannot tell which arguments and authorities sections in the brief address which issues. Consequently, we address only the issues raised by arguments presented in the body of Appellants' brief. *See* Tex.R.App. P. 38.1(h) (requiring that for an issue to be properly before this court, the issue must be supported by argument and authorities); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex.1994).

2. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000).

room personnel performed an EKG on Scott and confirmed that he was experiencing ventricular tachycardia.

Scott indicated when he arrived at the Medical Center that he did not want to be "shocked," that is, cardioverted. Scott was conscious, stable, and in no pain. So, Dr. Kimberly Zeh, the emergency room doctor, ordered two different injections for Scott and one intravenous drip, but Scott's accelerated heartbeat continued. Dr. Zeh contacted the on-call cardiologist, Dr. John Osborne, and as a result of her conversation with Dr. Osborne, she ordered that five milligrams of Verapamil be administered to Scott. Eric Johansen, a paramedic working in the Medical Center's emergency room as an employee, administered the drug to Scott. Within two minutes, Scott's blood pressure "crashed," he had a convulsion, and he went into cardiac arrest.

Scott suffered brain damage from the lack of adequate oxygenation of his brain during his cardiac arrest. He resides in a nursing home, and although he breathes on his own, he lacks any independent motor function and is unable to speak.

### III. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

In their first issue, Appellants contend that legally and factually insufficient evidence exists to support the jury's finding in special question 1 that their negligence proximately caused Scott's injuries. Specifically, Appellants challenge the evidence supporting the jury's finding of proximate cause.[3] In their third issue, Appellants contend that the jury's malice finding is

not supported by legally and factually sufficient evidence.

### A. Standards of Review

#### 1. Legal Sufficiency

In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex.2002).

#### 2. Factual Sufficiency

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

#### 3. Legal and Factual Sufficiency Challenges in Light of Clear and Con-

---

**3.** The argument and authorities portion of Appellants' brief does not challenge the sufficiency of the evidence to support the jury's negligence findings. Thus, this issue is not before us. *See* TEX.R.APP. P. 38.1(h). We

nonetheless include some of the negligence evidence in our review of the facts because this evidence touches upon the proximate cause and malice issues that Appellants have raised.

**vincing Evidence Burden of Proof on Malice**

■ The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing burden of proof. *Accord In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex.2002) (discussing legal sufficiency review in termination of parental rights appeal); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002) (discussing factual sufficiency review in termination of parental rights appeal). Both legal and factual sufficiency reviews of a finding required to be based on clear and convincing evidence must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *see also Kroger Tex. Ltd. P'ship v. Suberu*, 113 S.W.3d 588, 601 (Tex.App.-Dallas 2003, pet. filed) (applying standards of review enunciated in *J.F.C.* and *C.H.* to legal and factual sufficiency challenges to evidence of malice).

■ With respect to a legal sufficiency point, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief of the matter required to be proved by clear and convincing evidence. *C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm conviction or belief, then the evidence is factually insufficient. *Id.; Kroger*, 113 S.W.3d at 601.

**B. Evidence of Proximate Cause and Malice**

Verapamil is a drug that is contraindicated for treatment of ventricular tachycardia. Given to patients with ventricular tachycardia, it can lead to "disastrous consequences," including death. Verapamil may be effective to slow rapid heartbeat caused by supraventricular tachycardia— tachycardia originating superior to or above the heart's ventricals. However, distinguishing supraventricular tachycardia from ventricular tachycardia is difficult, and ventricular tachycardia is more common than supraventricular tachycardia. Therefore, the medical literature, including the Advanced Cardiac Life Support ("ACLS") manual, warns all medical personnel to simply assume that "wide-complex" tachycardia and "wide-QRS," that is tachycardia that may be ventricular or supraventricular, is in fact ventricular tachycardia.

The ACLS manual repeatedly warns against giving Verapamil to patients experiencing ventricular tachycardia:

Wide QRS tachycardia of uncertain origin should be considered VT [ventricular tachycardia] and treated as such until proven otherwise.... If the patient is stable in the presence of rapid, wide-QRS tachycardia, **do not treat with [V]erapamil** but consider such agents as procainamide.

In summary, emergency care providers should remember:

*Rule No. 1:* Wide QRS tachycardia is VT until proven otherwise.

*Rule No. 2:* Always remember rule No. 1.

Under "Critical Points to Remember," the ACLS manual again warns:

> Administration of [V]erapamil to a patient with VT can be a **lethal error.** Verapamil can accelerate the heart rate and decrease the blood pressure.... Authors have reported numerous examples of adverse effects, including death. Do not give Verapamil to patients with a wide-complex tachycardia unless the tachycardia is known with certainty to be supraventricular in origin.

The ACLS tachycardia algorithm[4] again warns, "Verapamil is not effective for the treatment of most types of ventricular tachycardia" because "[i]t may induce severe hypotension and predispose the patient to the development of ventricular fibrillation." Finally, the ACLS manual states, "The tachycardia algorithm was carefully constructed to restrict the use of Verapamil to only patients with narrow-complex PSVT with normal or elevated blood pressures." The package insert for Verapamil likewise specifically warns that Verapamil is contraindicated for ventricular tachycardia and explains that "administration of intravenous Verapamil to patients with wide-complex ventricular-tachycardia can result in marked hemodynamic deterioration and ventricular fibrillation."

On the evening of January 19, 2000, when Dr. Zeh ordered that Verapamil be given to Scott, the following individuals were in Scott's treatment room: Nurse Crain; Alma Heskes, R.N., the House Supervisor (top/head nurse) at the Medical Center and part of the Medical Center's administration; Johansen; and Dr. Zeh.[5]

Nurse Crain testified that she was ACLS certified, i.e., certified in Advanced Cardiac Life Support. This certification requires the applicant to know the material set forth in the ACLS manual and to take and pass a test over the material. An emergency room nurse should know ACLS protocol.

Nurse Crain testified that she was aware of all of the above recited warnings contained in the ACLS manual concerning the administration of Verapamil to a patient experiencing ventricular tachycardia. When Dr. Zeh ordered Verapamil for Scott, Nurse Crain immediately had a serious question about whether Verapamil was an appropriate medication for him. She said, "Verapamil, are you sure?" and Dr. Zeh said, "Yes."[6] Nonetheless, even after Dr. Zeh said "yes," Nurse Crain still had a serious question about whether Verapamil was an appropriate medication for Scott. She knew that Dr. Zeh's order for Verapamil presented an "extreme degree of risk" to Scott. Specifically, Nurse Crain testified:

> Q. ... Based upon the information that you knew as a nurse, based upon the information that we have already gone over this morning, severe decrease in blood pressure is exactly what can happen if you give Verapamil to a patient with ventricular tachycardia, correct?
>
> A. It's possible that could happen.

---

4. This is a flowchart showing the recommended sequence of medications for three types of tachycardia.

5. The Medical Center stipulated that Lisa Crain, Eric Johansen, and Alma Heskes were each within the course and scope of their employment with the Medical Center at the time of the events at issue in this lawsuit and that there need be no submission of any issue or instruction to the jury on this point.

6. In her responses to Scott's requests for admissions, Nurse Crain answered "Admitted" to the following: "Admit to the Court and jury in this case that you did not question Kim Zeh, M.D., regarding Verapamil being given."

Q. As a matter of fact, according to the ACLS manual, it can have disastrous consequences?

A. It says that it can be lethal.

Q. It can be lethal, and it can have "disastrous consequences." (Indicating) Isn't that what it says?

A. Yes, sir.

Q. When the order was given for Verapamil, and you said, "Verapamil, are you sure?" to Dr. Zeh, and she said something like, "Yes, Verapamil"; did I get that right so far?

A. That is correct.

Q. And you still had your serious question, as we have already established?

A. Yes, sir.

Q. You knew that there was the potential for causing harm because there was an extreme degree of risk in giving Verapamil to Scott Bush, correct?

A. Yes.

Nurse Crain agreed that the nursing standard of care required her to intervene to prevent complications in a patient's condition and that her failure to intervene would be a violation of the nursing standard of care. She agreed that the nursing standard of care required her to exercise her own nursing judgment if she felt a doctor ordered a medicine with adverse consequences to the patient.

A Medical Center policy entitled "Protocol to Follow When a Nurse Questions A Physician Order" provides, in pertinent part:

POLICY: To ensure the safety and rights of the patient, Las Colinas Medical Center has developed the following protocol in conjunction with the medical staff for the nurse to follow whenever a question arises regarding a physician order or the attending physician cannot be reached.

PROCEDURE:

A. If a nurse has any reason to doubt or question the care provided to any patient or believes that appropriate consultation is needed and has not been obtained, he/she shall call this to the attention of his/her superior who in turn may refer the matter to the House Supervisor. If warranted, the House Supervisor may bring the matter to the attention of the attending physician, the Chief Operations Officer, the Chief of Staff, or the Department Chairman, as appropriate. . . .

B. Nursing personnel are responsible for the "knowledge of the rationale for and the effects thereof, in the administration of medications and/or treatments as prescribed by a licensed physician or dentist." *Therefore, nurses are responsible for questioning medications ordered prior to administering the drug.* Such action should not delay administration of the drug. When a nurse has reason to question any order and a delay in administration of the drug or treatment will be necessitated the prescribing physician will be notified. In addition referral will be made to the House Supervisor. [Emphasis added.]

Nurse Crain testified that this Medical Center policy imposed a separate duty upon her to intervene before Verapamil was administered to Scott.

Finally, Nurse Crain testified:

Q. So basically what this amounts to is that with your serious question, knowing that there was an extreme degree of risk that was going to cause potential harm to Scott Bush, knowing all that,

you still chose to allow him to be given the Verapamil anyway?

A. Yes, I did.

Nurse Heskes testified that she walked into Scott's treatment room and asked, "What's going on?" Although Nurse Heskes could not remember exactly what response she received to this question, she learned that Scott was in ventricular tachycardia and that he had been given lidocaine and Bretylium. Except for his tachycardia, Scott was stable in all respects when Nurse Heskes entered the treatment room.

Although Nurse Heskes's ACLS certification was lapsed on the night Scott came into the emergency room, Nurse Heskes had been ACLS certified in the past and knew that giving Verapamil to a patient with ventricular tachycardia could be a lethal error; she knew Verapamil was contraindicated for ventricular tachycardia. Nurse Heskes testified that she had a serious question about allowing Verapamil to be given to Scott. She admitted that both her job description with the Medical Center and the nursing standard of care required her to intervene if she or a nurse she was supervising had a serious question about the administration of a medicine involving an extreme risk of harm to a patient. She testified that despite her duty to intervene, she did not. Nurse Heskes testified:

Q. And when you found out that a nurse that was under your supervision, since you were the top nurse at the entire hospital that night, a nurse under your supervision was having a serious question about a medication that she felt involved an extreme risk of harm to a patient, you had an obligation under your own job description to intervene, didn't you?

A. Yes.

Q. But as we have already seen, you didn't do that, did you?

A. I didn't intervene, though I heard—can I answer you more? Oh.

Q. You didn't intervene, did you?

A. I did not intervene.

Q. But you had a duty to intervene, didn't you?

A. ·Yes.

Q. And you breached that duty by not intervening, didn't you?

A. I may have breached.

Nurse Heskes further testified:

Q. ... Ms. Heskes, even with the serious question that you had, knowing that there was an extreme degree of risk that could cause potential and serious harm to a patient like Scott Bush in his condition, you failed to intervene and simply allowed Verapamil to be injected into Scott Bush, didn't you?

A. The Verapamil was given.

Q. Is that a yes?

A. Yes.

Johansen was the first paramedic ever employed by the Medical Center to work in its emergency room. Consequently, the Medical Center had no written job description for emergency room paramedics. Soon after he was hired, Johansen met with Dr. Brian Zachriah, the head of the Medical Center's Emergency Department, concerning his emergency room paramedic job description. Johansen took notes during this meeting, but even eight months later, when Johansen injected Scott with Verapamil, the Medical Center had not finalized his job description. Nothing in Johansen's notes from the meeting with Dr. Zachriah and nothing in any approved Medical Center policy or job description authorized Johansen to administer cardiac medications in the emergency room. In fact, a Medical Center policy titled "Procedures Performed by Non Physicians" pro-

hibited a paramedic like Johansen from administering cardiac medications.

Johansen was ACLS certified. He knew Scott was experiencing ventricular tachycardia. He knew that giving Verapamil to a person experiencing ventricular tachycardia could be a lethal error. Johansen testified that, as a paramedic working as an employee in the Medical Center's emergency room, the order for Verapamil raised a question in his mind as to whether the medication was appropriate for Scott. While he was filling the syringe with Verapamil, he had a serious question about the propriety of this medication for Scott. Johansen testified that he and Nurse Crain looked at each other, "still like unsure, like are we giving Verapamil." Nurse Crain then nodded her head to Johansen, and he interpreted this nod as an indication that he was to go ahead and inject the Verapamil. Even while he was injecting the Verapamil, Johansen still had a serious question about the propriety of giving Verapamil. Johansen testified:

Q. Well, to you with your level of training, your level of knowledge, your level of familiarity with the ACLS materials, to you the Verapamil was clearly contraindicated to be given to Scott Bush, correct?

A. Yes, sir.

Q. But you still gave it to him.

A. Yes, sir.

Finally, Dr. Zeh, the emergency room physician who ordered Verapamil for Scott, swore that during her phone consultation with the on-call cardiologist, Dr. Osborne, he told her to administer five milligrams of Verapamil to Scott because Scott's last EKG showed a "left bundle branch block" that would not "break" without Verapamil. Dr. Zeh explained that she was ACLS certified and that she also had gone through her emergency room

board certification a year and a half before Scott came into the emergency room that night. She agreed that she knew Verapamil was generally contraindicated for persons experiencing ventricular tachycardia, but said that Scott was considered outside the ACLS guidelines because he had been nonresponsive to lidocaine and Bretylium; he was on Tambocor; and he had undergone a surgical procedure a few years earlier, an ablation, that was unsuccessful in eliminating his recurrent ventricular tachycardia.

Dr. Zeh testified:

Q. So just to make sure I am clear: Did you have an opinion at that time as to whether or not the order for Verapamil was, in your judgement, in his best interest?

A. The medications I had given to Mr. Bush prior to the Verapamil had not had the desired effect. And this was my next step that was recommended to me by my cardiologist. And I felt—again, I felt comfortable enough with my consultant to go ahead and not question it and give that medicine. I am not sure I am . . . .

Q. Would you have given it, yourself?

A. I did not give it myself, no.

Q. Would you have?

A. No, sir.

Dr. Zeh also testified that neither Nurse Crain or Johansen questioned her order for Verapamil. She testified that both the nursing and paramedic standards of care require that if a nurse or a paramedic has a serious question about the propriety of a particular medication ordered by a doctor, they should not participate in the carrying out of that order until their question is addressed. Dr. Zeh testified that she expected and wanted a nurse or a paramedic who had a serious question about one of

her orders to bring it to her attention, and if the question was serious enough, to refuse to participate in carrying out the order. Dr. Zeh testified that Nurse Heskes, Nurse Crain, and Johansen all failed to do that in this case.

Every person in Scott's treatment room—Nurse Crain, Johansen, Nurse Heskes, and Dr. Zeh—agreed that Scott was "hemodynamically stable" before he received the Verapamil. That is, Scott's blood pressure was fine, he was conscious, he was talking, he was experiencing no pain, and he was not experiencing nausea or clamminess. Johansen injected Verapamil into Scott at 11:35 p.m. Within two minutes, Scott's blood pressure had dropped, his skin color was pale, and he began convulsing. The next entry in Scott's medical record shows that by 11:45 p.m. he was in complete cardiac arrest—was not breathing and had no pulse—and was being "bagged" with an Ambu bag. Finally, sometime after midnight, records document a pulse for Scott, and at 12:28 p.m., he was transferred to the Medical Center's intensive care unit.

Dr. Osborne, the on-call cardiologist who spoke with Dr. Zeh, testified that on January 19, 2000, he was driving home from the Medical Center when Dr. Zeh paged him. He returned the page and spoke with Dr. Zeh. Dr. Zeh told him that Scott was in the emergency room and was experiencing ventricular tachycardia, but was hemodynamically stable. Dr. Osborne said that he did not indicate anything specific to Dr. Zeh at the conclusion of the conversation, but decided to turn around and head back to the Medical Center. Approximately ten to fifteen minutes after the first page, Dr. Zeh again paged Dr. Osborne. In this conversation, she asked for an explanation of why Scott's heart would not convert to a normal rhythm, despite the administration of lidocaine and Bretylium. In response to Dr. Zeh's question, Dr. Osborne explained that:

[T]here are forms of ventricular tachycardias that don't respond to medications necessarily like lidocaine or Bretylium, and that these tachycardias can sometimes be seen more in younger people, people with what we call structurally normal hearts, that is, they've never had a heart attack or heart failure or fluid on the lungs or what we call cardiomyopathy, any prior damage to the heart, the heart as far as we can tell is normal, and that these kind of tachycardias don't typically respond to medications like lidocaine and Bretylium because they have different mechanisms by which they cause the ventricular tachycardia.

Dr. Osborne also mentioned that some of these types of ventricular tachycardias that may exist in young people with structurally normal hearts may be classified as Verapamil-sensitive tachycardias. Dr. Osborne provided this information to Dr. Zeh to "help to enlighten her as far as possibilities that may be existing that could explain what she's seeing." He concluded the conversation by confirming that Scott remained hemodynamically stable and by telling Dr. Zeh to "sit tight and I'll be there shortly." Dr. Osborne said that he did not order Verapamil for Scott and that nothing he said to Dr. Zeh was intended to convey that Verapamil should be given to Scott. Dr. Osborne said he would not have ordered Verapamil for Scott if he had been in the emergency room.

Dr. Osborne testified that the Verapamil caused Scott's blood pressure to fall, the fall in blood pressure caused an anoxic arrest, and the anoxic arrest led to Scott's hypoxic brain injury. He then testified:

Q. You, you told us just a little while ago that it's probable, more likely than not, that the Verapamil started the

events leading to the hypoxic brain injury, correct?

A. That's correct.

He further testified:

Q. You indicated that he had severe anoxic encephalopathy. Would you explain to the jury what that is?

A. Essentially it just means brain damage due to lack of blood flow to the brain.

Q. What you have—

A. Or lack of oxygen to the brain.

Q. What you have already described as starting with the events caused by the Verapamil?

A. Yes.

. . . .

Q. In all reasonable medical probability, if Scott had not been given Verapamil, in all likelihood, he'd be leading a normal life today, wouldn't he?

A. I—honestly I don't know. I—it's possible.

Q. Well, it's more likely than not, isn't it, given the information that we know and with what you've already told us regarding the Verapamil, isn't it more likely than not?

A. I think that's probably the case.

Q. Scott didn't cause his own brain damage, did he?

A. No.

Q. Those who allowed Verapamil to be administered to him started the series of events that led and caused his brain damage, correct?

A. I would say I'd agree with that.

Still later Dr. Osborne testified:

Q. . . . . None of the answers you gave to the hospital lawyer changes your sworn testimony to the jury in this case about what you said earlier today that Verapamil should have never been given to Scott Bush, correct?

A. That's correct.

Q. And none of the answers that you gave to the hospital lawyer, changes your sworn testimony to these people that in all likelihood, if Verapamil had never been given to Scott Bush, he would probably be leading a normal life today, correct?

A. That's correct.

Jan Winter was employed by the Medical Center as a nurse manager when Scott came to the emergency room. In the Medical Center's hierarchy, a nurse manager is above the charge nurse, but below the House Supervisor. Part of Winter's job duties as a nurse manager required her to be available on-call in case hospital staff, such as a nurse like Crain or a paramedic like Johansen, had questions. Winter had authority and supervisory control over the nurses and hospital personnel working under her, including Nurse Crain and Johansen. She explained that both nurses and paramedics have their own nursing and paramedic standards of care; they cannot just blindly follow a doctor's order. She testified that the standard of care for both nurses and paramedics is to refuse to administer medication if they have a serious, unanswered question about the propriety of a medication. She testified:

Q. . . . If a nurse and a paramedic still admit that they have a serious question, knowing that there is an extreme degree of risk that's likely to cause potential harm and injury to the patient, wouldn't you agree that they should not participate in the administration of the medication as long as that serious question remains, knowing that there is an extreme risk that their conduct is going to result in harm to the patient in all likelihood; wouldn't you agree they should not participate?

A. If they have a serious question, they should not participate.

Q. And if they do, it is a breach of their standard of care, isn't it?

A. Yes, I believe so.

Winter was shown Nurse Crain's and Johansen's trial testimony that both of them, although they each had a serious question about the propriety of Verapamil for Scott and knew that this drug posed an extreme degree of risk to him, nonetheless chose to do nothing to prevent or to delay the administration of the drug. After reviewing this testimony, Winter agreed that, based on the questions and answers, both Nurse Crain and Johansen "knew better, but did it anyway."

Lane Looka, a registered nurse paramedic, testified that he had reviewed the Medical Center's policies and procedures, as well as the sworn testimony of Nurse Crain, Johansen, Dr. Osborne, Nurse Heskes, Dr. Zachariah, and others. Looka explained that, under the job description provided to Johansen, Johansen was functioning in the Medical Center's emergency room as a paramedic nurse tech and was not authorized to administer medicines at all:

A. ... Eric Johansen, if you refer back to that job description, it does not indicate as a paramedic nurse tech that they are allowed to give any medications whatsoever. The official job description of Eric Johansen was the one that was shown just then and there's no mention of him being able to give any kind of medications at all in the emergency department.

Q. And were you also shown what we have now marked as Exhibit 19, which are Procedures Performed by Nonphysicians, including paramedics at Columbia Las Colinas Medical Center?

A. Yes.

Q. And if we look at Item B on the second page under Paramedics, would you tell us whether any of the items would allow Eric Johansen to be administering Verapamil to Scott Bush?

A. No, they do not.

Q. I would like to note also that Mr. Johansen not only administered Verapamil but he did administer the lidocaine and Bretylium as well prior to that. Was he allowed to do that, in your opinion?

A. He was not allowed to do those either.

Looka was provided with the legal definitions of negligence and ordinary care and opined that Nurse Crain and Johansen were both negligent in participating in the administration of Verapamil to Scott. Looka was also provided with the legal definition of malice and opined that Nurse Crain's and Johansen's conduct fell within the legal definition of malice. Looka testified:

Q. Would you tell the jury why the conduct of Lisa Crain and Eric Johansen in your opinion falls under this definition of malice that we have gone over?

A. Basically, Lisa Crain, Eric Johansen both knowingly, consciously knew that there's significant risk and potential harm of giving Mr. Bush the Verapamil. They had numerous things in place that they could have done to stop it, postpone it. They could have not given it and not even put themselves in this situation. But they chose not to. They ignored it. They ignored the chain of command and went ahead, and knowing that Verapamil posed great risk and side effects to Mr. Bush, they gave it anyway.

According to Looka, "Lisa Crain and Eric Johansen should have caught that error [the order for Verapamil] and should not have given medication."

Dr. Zachariah testified that Scott's emergency room department records show that Scott's chief complaint was ventricular tachycardia. He agreed that Verapamil is contraindicated for patients suffering ventricular tachycardia. Assuming a patient presents with the same symptoms as Scott, Verapamil is not the correct medicine to give.

Dr. Peter Bastone, president and chief executive officer for Mission Hospital Regional Medical Center in Mission Viejo, California, testified that the Medical Center was negligent in several respects, including by failing to have a job description for paramedics like Johansen. He said that the failure to have job descriptions creates an "extraordinary exposure in terms of something actually going wrong or something being delegated or given to an individual who may not have the competency to follow through or may end up being an atoward [sic] outcome in regards to that." Dr. Bastone was provided with the definition of malice and testified that in his opinion the Medical Center's conduct— including its failure to have a job description for Johansen more than eight months after he started working in the emergency room and despite Johansen's questions regarding his duties—fell within the legal definition of malice.

Dr. Lawrence Hum, an emergency medicine physician, testified that the ACLS manual simply sets forth guidelines. These guidelines may be deviated from whenever necessary to promote the best interest of the patient. According to Dr. Hum, Verapamil is not contraindicated for all patients suffering ventricular tachycardia, but only for older patients with clogged arteries who have ventricular tachycardia. He said Verapamil was not contraindicated for Scott. Dr. Lawrence also testified that the nursing and paramedic standard of care simply require a nurse and a paramedic to follow the doctor's order and that Nurse Crain and Johansen met or exceeded that standard here.

Judy Selfridge–Thomas, an emergency room nurse, testified that it was outside the scope of an emergency room nurse's abilities to diagnose a "left bundle branch block" on an EKG. She testified that the ACLS manual sets forth only guidelines and that any specific case may deviate from these suggested guidelines. She opined that Nurse Crain and Johansen met the standard of care by administering Verapamil to Scott.

Dr. Theodore Chan, an emergency room doctor, testified that an emergency room doctor like Dr. Zeh is responsible for the medicines he or she orders. No matter how many consultations the emergency room doctor receives, ultimately, the emergency room doctor is responsible for the medicines she orders. According to Dr. Chan, Dr. Zeh was negligent in ordering Verapamil, and Dr. Zeh's negligence proximately caused the occurrence in question.

Dr. Jay Schapira, a cardiologist, testified that under the facts presented by Scott's case, the standard of care requires a cardiologist to advise an emergency room doctor not to administer Verapamil to a person in Scott's condition. He swore that Dr. Osborne violated the standard of care by failing to advise Dr. Zeh not to administer Verapamil and that Dr. Osborne's negligence proximately caused the occurrence here.

Dr. David Allen Schwartz, a cardiologist, testified that Verapamil was an appropriate medication for Scott. Dr. Schwartz testified that based on Scott's medical records from years earlier, when Scott was first diagnosed with ventricular tachycardia and the results of a cardiac electrophysiology study conducted near that time, he could tell that Scott had a "focal site of the

tachycardia or the rhythm disturbance to arise from part of the left ventricle." Dr. Schwartz explained:

The left ventricle is the major pumping chamber of the heart. It pumps the blood to the brain and the rest of the body and it's—and typically—and it's located in a specific section that puts— puts it into a category that we call idiopathic left ventricular tachycardia.

. . . .

And the important point for this and the important point, I think as it relates to this situation, is that it is Verapamilsensitive.

Dr. Schwartz reviewed Scott's January 19, 2000 EKGs from the Medical Center and said one showed an "aberrant right bundle branch block with a left anterior hemiblock pattern or a—certainly a—which again tells you that it's arising from the same place that the other tachycardia was arising." Finally, Dr. Schwartz testified:

Q. ... For a patient in Scott Bush's condition, understanding the history that we have discussed from East Texas Medical Center and Presbyterian, understanding the EKGs from 1998 and the one that you saw that evening, and understanding your review of the records, with his particular heart condition, would Verapamil be a reasonable or an appropriate medication?

A. The answer to the question is, yes. And I believe I have stated that in my expert report.

Q. Why?

A. This is a one—this—this is certainly the only ventricular tachycardia that is effectively responsive to Verapamil. And identifying this particular tachycardia as being idiopathic left ventricular tachycardia, makes it a Verapamil-sensitive tachycardia. And you have tried a couple of other medications

prior to this time that I am sure that— that revert most cases of tachycardia, ventricular tachycardia, and they were not successful. So—

## C. Proximate Cause Evidence is Legally and Factually Sufficient

■■■■ Plaintiffs in medical negligence cases are required to prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged. *See Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993). To establish proximate cause, the plaintiff must prove (1) foreseeability and (2) cause-in-fact. *Leitch,* 935 S.W.2d at 118–19. The ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995); *see Arguelles v. U.T. Family Med. Ctr.,* 941 S.W.2d 255, 258 (Tex.App.-Corpus Christi 1996, no writ). The precise words of "reasonable medical probability" are not essential, but evidence of causation must still rise above mere conjecture or possibility. *See Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988); *Brownsville Pediatric Ass'n v. Reyes,* 68 S.W.3d 184, 189 (Tex.App.-Corpus Christi 2002, no pet.). The trier of fact may decide the issue of proximate cause in medical malpractice cases based upon: (1) general experience and common sense from which reasonable persons can determine causation; (2) scientific principles provided by expert testimony allowing the fact finder to establish a traceable chain of causation from the condition back to the event; or (3) a probable causal relationship as articulated by expert testimony. *Marvelli v. Alston,* 100 S.W.3d 460, 470 (Tex.App.-Fort Worth 2003, pet. de-

nied) (citing *Parker v. Employers Mut. Liab. Ins. Co. of Wis.*, 440 S.W.2d 43, 46 (Tex.1969)).

### 1. Legal Sufficiency

■ The evidence here conclusively established that Scott was experiencing ventricular tachycardia. No evidence to the contrary exists. The evidence here likewise conclusively established that Scott was hemodynamically stable prior to the administration of Verapamil. Scott's blood pressure did not drop following the administration of lidocaine or Bretylium. The ACLS manual and the Verapamil package insert both warn that Verapamil should not be administered to a patient experiencing ventricular tachycardia because the drug can cause "marked hemodynamic deterioration," which in layman's terms is a bottoming out of blood pressure. All of the medical experts testified, and Scott's medical records demonstrate, that is exactly what happened to him two minutes after he received Verapamil.

Additionally, Dr. Osborne testified that Scott's hemodynamic deterioration within two minutes of the administration of Verapamil is the "time frame that you would expect the effects of Verapamil to start taking place;" it is "the right temporal relationship" to have been caused by the administration of Verapamil. Osborne repeatedly testified that Verapamil started the sequence of events leading to Scott's brain injury. Further, Dr. Zeh testified that she would not have administered the Verapamil herself, leaving the jury free to infer that if the medical personnel in Scott's room had voiced their serious concerns about the propriety of the administration of Verapamil or had refused to participate in the administration of Verapamil to Scott, the drug would not have been given.

Considering only the evidence and inferences supporting the jury's proximate cause finding and disregarding all evidence and inferences to the contrary, more than a scintilla of evidence exists that Scott's injury was foreseeable. Nurse Crain, Johansen, and Nurse Heskes, as well as several experts, all testified that they knew prior to the administration of Verapamil that the drug posed an extreme risk of harm to Scott, i.e., that a risk of injury or death was foreseeable. Likewise, considering only the evidence and inferences supporting the jury's proximate cause finding and disregarding all evidence and inferences to the contrary, more than a scintilla of evidence exists that the administration of Verapamil was a cause in fact of Scott's injury. The trier of fact was free to determine based upon general experience and common sense that because Scott was sitting, talking, in no pain, and experiencing no nausea or clamminess until he was injected with Verapamil—which according to the package insert, the ACLS manual, and expert testimony should not have been given to him—and because two minutes after the administration of Verapamil Scott suffered the exact disastrous consequence warned against, the Verapamil caused the disastrous consequence.

Likewise, scientific principles provided by Dr. Osborne establish a traceable chain of causation from the condition—Scott's brain damage—back to the event—the administration of Verapamil. Dr. Osborne testified that the Verapamil caused Scott's blood pressure to fall, the fall in blood pressure caused an anoxic arrest, and the anoxic arrest led to Scott's hypoxic brain injury. Finally, Dr. Osborne opined that but for the administration of Verapamil, Scott would probably be leading a normal life today. We hold that the evidence is legally sufficient to support the jury's finding that Appellants' negligence proximately caused Scott's injury.

### 2. Factual Sufficiency

Likewise, viewing all of the evidence, the evidence supporting the jury's answers to special question 1 is not so weak, nor is the evidence to the contrary so overwhelming, that the jury's answer should be set aside and a new trial ordered. *See Garza*, 395 S.W.2d at 823. Indeed, Appellants do not point to specific evidence as constituting overwhelming contrary evidence concerning proximate cause. Instead, without a factual sufficiency analysis, in one sentence Appellants simply assert that the evidence supporting the jury's proximate cause finding is so weak that this court should reverse and remand for a new trial. We have carefully reviewed the entire record in detail, and we hold that the evidence supporting the jury's answers to special question 1 is not so weak nor the contrary evidence so overwhelming that a new trial is required. We overrule Appellants' first issue.

### D. Evidence of Malice is Legally and Factually Sufficient

In their third issue, Appellants contend that the evidence is legally and factually insufficient to support the jury's malice finding against the Medical Center. Specifically, the Medical Center claims that there is insufficient evidence to establish the objective element of malice and that no evidence exists that a vice principal of the Medical Center was subjectively aware of or consciously indifferent to the risk of injury to Scott.

▮▮▮▮ Generally, the definition of malice under section 41.001(7)(B) consists of two components: one objective, one subjective. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, sec. 41.001(7)(B)(i), 2003 Tex. Gen. Laws 887, 887 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code § 41.001(7) (Vernon Supp. 2004)); *see also Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325–26 (Tex. 1993). Objectively, the defendant's con-duct must involve an extreme risk of harm, a significantly higher threshold than the objective reasonable person test for negligence. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994). Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct. *Id.* Evidence of simple negligence is not enough to prove either the objective or subjective components of malice. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998).

▮▮▮▮ The objective malice prong is a function of both the magnitude and the probability of the potential injury and is not satisfied if the defendant's conduct merely creates a remote possibility of serious injury. *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995). To satisfy the objective malice prong, the defendant's conduct must, viewed objectively from the actor's standpoint, involve an extreme degree of risk. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). "Extreme risk" means not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Id.* Circumstantial evidence is sufficient to prove either element of malice. *Id.; Ellender*, 968 S.W.2d at 921; *Moriel*, 879 S.W.2d at 22–23.

▮▮▮▮ A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it commits gross negligence through the actions or inactions of a vice principal. *Ellender*, 968 S.W.2d at 921–22; *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 389 (Tex. 1997). "Vice principal" encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those

to whom the master has confided the management of the whole or a department or a division of the business. *Hammerly Oaks,* 958 S.W.2d at 391.

### 1. Legal Sufficiency

■ Considering all the evidence in the light most favorable to the jury's malice finding, we hold that sufficient evidence exists from which a reasonable trier of fact could have formed a firm belief or conviction that, viewed from Nurse Crain's,[7] Johansen's, and Nurse Heskes's standpoint, the administration of Verapamil involved an extreme degree of risk to Scott. In fact, all three testified that they knew and understood from the express warnings in the ACLS manual that the administration of Verapamil to a person who was experiencing ventricular tachycardia, like Scott, could have "lethal," "disastrous" consequences. The magnitude of the injury (i.e. death) and the probability of that injury—probable enough to warrant a specific ACLS tachycardia algorithm "carefully constructed to restrict the use of Verapamil to only patients with narrow-complex PSVT with normal or elevated blood pressure"—demonstrates that the administration of Verapamil to Scott posed an extreme degree of risk. *See Lee Lewis,* 70 S.W.3d at 785; *Kroger,* 113 S.W.3d at 601.

■ Citing *Louisiana–Pacific Corp. v. Andrade,* the Medical Center next argues that no evidence exists that a vice principal of the Medical Center was subjectively aware of or consciously indifferent to the risk of injury to Scott. 19 S.W.3d 245 (Tex.1999). The second malice element, "actual awareness," means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not

care. *Lee Lewis,* 70 S.W.3d at 785. Again, circumstantial evidence is sufficient to prove this element. *Id.*

■ The court's charge provided the jury with the *Hammerly Oaks* four-pronged definition of a vice principal. The evidence showed that Nurse Heskes, the House Supervisor, was part of the hospital management, was responsible for supervising the nursing units and ancillary departments, and was the top nurse in the entire Medical Center. Thus, she met the charge's definition of vice principal. *See, e.g., Texarkana Mem'l Hosp., Inc. v. Firth,* 746 S.W.2d 494, 496–98 (Tex.App.-Texarkana 1988, no writ). Nurse Heskes testified that she was present in Scott's treatment room when he received Verapamil. Nurse Heskes testified that she had a serious question about the propriety of administering Verapamil, and knew that Nurse Crain and Johansen did, too; yet she did nothing:

> Q. And not only did you have a serious question about an extreme degree of potential harm this was going to cause Scott, and not only did you know that two people under you, another nurse and a paramedic had a serious question about an extreme degree of risk that could lead to serious and potential harm to Scott, but, in additional to all of that, you allowed a paramedic to inject a cardiac medication when you knew that he was really not authorized to do so, didn't you?
>
> A. That's correct.

Nurse Heskes testified that she had a duty to intervene to prevent the administration of Verapamil, but that she did not inter-

---

7. Appellants contend that, because the jury answered "no" to special question number 5, the malice question as to Nurse Crain, Nurse Crain's conduct cannot be considered in determining whether the Medical Center acted with malice. We need not address this contention because clear and convincing evidence exists supporting the jury's malice finding even if Nurse Crain's conduct is not considered.

**856**

vene and that she may have breached her duty to intervene. This evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence: that a vice principal of the Medical Center objectively recognized that the administration of Verapamil to Scott involved an extreme risk of harm and subjectively had actual awareness of this extreme risk, but nonetheless chose to breach her duty to intervene to prevent the harm or, alternatively, ratified the conduct despite the extreme risk of harm by failing to intervene. *See J.F.C.*, 96 S.W.3d at 265–66.

The present facts are not analogous to the *Andrade* facts, where the plaintiff was injured when he touched an electrified crane rail. 19 S.W.3d at 246–47. In *Andrade*, the corporate managers all subjectively thought that the crane had been "locked out," i.e., that the electrical power to the crane had been shut off. *Id.* at 248. Thus, the supreme court explained that there was not legally sufficient evidence that corporate personnel knew the crane was energized and nevertheless did not care whether workers would encounter that risk. *Id.* Here, every person in Scott's treatment room, except Scott himself, testified that they knew the administration of Verapamil to Scott posed an extreme degree of risk and that they nonetheless participated in or failed to intervene in the administration of Verapamil. Unlike the facts in *Andrade*, there was no question here that Johansen and Nurse Heskes knew with certainty as Scott was being injected that he would encounter the risks posed by Verapamil. We hold that the evidence, viewed in the light most favorable to the jury's malice finding, is sufficient to permit a reasonable trier of fact to form a firm conviction or belief that the harm to Scott resulted from the Medical

Center's malice. *See J.F.C.*, 96 S.W.3d at 266.

**2. Factual Sufficiency**

We next consider whether, giving due consideration to the evidence the jury could reasonably have found to be clear and convincing evidence of malice, based on the entire record, the jury could reasonably form a firm conviction or belief regarding the Medical Center's malice. *See C.H.*, 89 S.W.3d at 25. We review the entire record to determine whether the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that the jury could not have reasonably formed a firm conviction or belief concerning malice by the Medical Center. *See id.* The Medical Center identifies particular evidence as contrary to the jury's malice finding. First, the Medical Center points to testimony that Nurse Crain, Johansen, and Nurse Heskes all relied upon "doctors that we trusted" in administering Verapamil to Scott negated the jury's malice finding. Each of these medical professionals, however, testified themselves that the nursing and paramedic standards of care required them to exercise their independent medical judgment, not to just blindly follow a doctor's order that they knew posed an extreme degree of risk to a patient. They all testified that Verapamil posed an extreme degree of risk to Scott and that they had a serious question about the propriety of Verapamil for him. Yet, Nurse Crain and Johansen admitted that they not only failed to intervene to prevent the administration of the drug to Scott but also participated in its administration. Nurse Heskes admitted that the standard of care required her to intervene in the administration of Verapamil and that she did not. Thus, in light of Nurse Crain's, Johansen's, and Nurse Heskes's admitted, independent duties to Scott under the applicable stan-

dards of care, the contention that they all "trusted the doctors" does not weigh very heavily, if at all, against the jury's malice finding.

The Medical Center also points to Johansen's testimony that he felt very badly about what happened to Scott. The Medical Center cites no case law, and our research has revealed no authority, supporting the contention that after-the-fact remorse excuses, or weighs against, a finding that at the time of the occurrence a defendant acted with malice. We hold that evidence of remorse does not weigh against the jury's malice finding although it may be considered by the jury in determining the *amount* of punitive damages award. *See Ellis County State Bank v. Keever*, 936 S.W.2d 683, 686 (Tex.App.-Dallas 1996, no writ) (recognizing remorse is factor in reviewing sufficiency of evidence supporting *amount* of punitive damage award).

Finally, the Medical Center points to Dr. Hum's testimony that the administration of Verapamil to Scott was appropriate. Dr. Hum's opinion that Verapamil was a proper medication for Scott is greatly outweighed by expert testimony, some of it from defense experts, that Verapamil was contraindicated for Scott. Nurse Crain, Johansen, Nurse Heskes, Dr. Osborne, Looka, Dr. Zachariah, and Dr. Chan all testified that Verapamil was contraindicated for Scott. Additionally, the documentary evidence—the ACLS manual and the Verapamil package insert—likewise establish that Verapamil was contraindicated for Scott.

The disputed evidence that the jury could not have credited in favor of its malice finding is not substantial. Based on the record as a whole, especially in view of the quantity of evidence supporting the jury's malice finding, the contrary evidence is simply not so significant that a fact finder could not have reasonably formed a firm conviction or belief concerning malice. *C.H.*, 89 S.W.3d at 25; *Kroger*, 113 S.W.3d at 601. Moreover, evidence of "some care" does not insulate a defendant from gross negligence liability. *Ellender*, 968 S.W.2d at 924. Consequently, based on the entire record, the jury could reasonably have formed a firm conviction or belief that, despite Dr. Zeh's order for Verapamil, Johansen and Nurse Heskes objectively recognized that the administration of Verapamil to Scott involved an extreme risk of harm and subjectively had actual awareness of this extreme risk, but nonetheless chose to participate in or fail to intervene in the administration of the drug, and in Nurse Heskes's case, ratified the administration of Verapamil by Johansen. *See C.H.*, 89 S.W.3d at 25. We overrule Appellants' third issue.

### IV. ALLEGED CHARGE ERROR

In their second issue, Appellants appear to argue that charge error occurred because some of the specific negligent acts pleaded by Scott within his negligence cause of action were supported by no evidence.[8] Appellants contend, therefore,

---

8. Appellants' second issue is:
   Even if the record contains sufficient evidence on one theory of negligence asserted by Plaintiff, which Appellants do not concede, the record contains no evidence to support submission to the jury of any of the Plaintiff's other four theories of negligence. Thus, the trial court's refusal to submit limiting instructions (in broad-form Question

Nos. 1, 2, and 4), which would have restricted the jury's consideration to only those negligence theories potentially supported by some conflicting evidence, constituted harmful error requiring reversal under *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000), and *Harris County v. Smith*, [96] S.W.3d [230] [(Tex.2002)]. The same error occurred in Question No. 4,

that the trial court erred by refusing to submit limiting instructions along with its broad-form negligence submission, telling the jury not to consider those specific acts of negligence. For example, the Medical Center requested that an instruction be submitted with the negligence question stating, "In considering the negligence of Las Colinas Medical Center, you should not consider the negligence, if any, of Las Colinas Medical Center in failing to have appropriate job descriptions for its employees." The Medical Center also requested other instructions such as, "In considering the negligence of Las Colinas Medical Center, you should not consider the delay, if any, in providing treatment to Scott Bush." The trial court refused to submit any of the limiting instructions requested by the Medical Center in connection with the broad-form negligence special question.[9]

■ The broad-form negligence special question submitted in this case simply does not present *Casteel/Harris County* error. In *Casteel,* the court's charge submitted five distinct DTPA-based theories of liability, along with eight other theories of liability, in a single broad-form question. 22 S.W.3d at 388. Because the plaintiff in *Casteel* lacked standing to assert four of the five DTPA theories, the trial court erred by submitting those theories to the jury. *Id.* The supreme court held that this error was harmful because the court of appeals could not determine whether the

jury based its verdict on an improperly submitted invalid theory or on a properly submitted valid theory. *Id.*

Here, Scott pleaded one theory of liability against Nurse Crain and one theory of liability against the Medical Center: negligence. Within his negligence pleading, Scott additionally pleaded specific negligent acts by Nurse Crain and by the Medical Center. But these acts are not separate theories of liability and do not constitute the assertion by Scott of any additional basis for recovery. *See id.* at 390 (recognizing that broad-form submission may not be feasible when there are alternative *liability* standards and the governing law is unsettled or when the trial court is unsure whether it should submit a particular theory of *liability*); *Crawford v. Deets,* 828 S.W.2d 795, 799–800 (Tex.App.-Fort Worth 1992, writ denied). Moreover, even if the specific acts of negligence alleged might be considered separate "theories of liability," in this case, unlike in *Casteel,* no valid theories of recovery were commingled in a listing with invalid theories of recovery in the broad-form question; thus, no charge error occurred. *See Excel v. Apodaca,* 51 S.W.3d 686, 700 (Tex.App.-Amarillo 2001) (holding Casteel does not apply to broad-form negligence question), *rev'd on other grounds,* 81 S.W.3d 817 (Tex.2002). The charge here properly submitted one theory of liability and recovery—negligence—

where the trial court submitted an instruction on ratification by the Hospital that was not supported by substantive law, that was legally incorrect, and that was not supported by any competent evidence. Because the jury was allowed to consider both a potentially valid theory for imputing malice to the Hospital and an invalid theory for imputing malice, the trial court's submission in Question No. 4 constituted harmful error requiring reversal under *Casteel* and *Smith.*

Appellants' brief nowhere mentions this specific issue, and the brief's table of contents does not contain a page number where the argument concerning this issue, or any other issue, is set forth.

9. Although the Medical Center requested and tendered limiting instructions, it did not object to the broad-form submission of the negligence question.

in a single broad-form question. TEX.R. CIV. P. 277; *Crawford,* 828 S.W.2d at 799–800.

Nor is the present case like *Harris County.* In *Harris County,* the trial court erroneously, over objection, instructed the jury in making a lump-sum damage award to consider a specific element of damages on which no evidence was presented. 96 S.W.3d at 231. Here, the trial court did not instruct the jury to consider or to not consider any specific act of negligence. The trial court simply provided the jury with the definitions of negligence, ordinary care, and proximate cause as to each of the defendants and asked, "Did the negligence, if any, of those named below proximately cause the occurrence in question?" *See* 3 COMM. ON PATTERN JURY CHARGES OF THE STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES § 51.3 (2002). Thus, the *Harris County* charge error is not present in this case.

Appellants have not cited, nor has our research revealed, any case holding that limiting instructions concerning pleaded, alternative, allegedly negligent acts are required to properly submit a single negligence liability theory. *Cf. Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984) (disavowing the proliferation of jury instructions in favor of simplicity in jury charges); *Excel,* 51 S.W.3d at 700 (refusing to apply *Casteel* analysis to broad-form negligence special question); *Crawford,* 828 S.W.2d at 799–800 (holding trial court correctly submitted broad-form negligence question in medical negligence case and did not abuse its discretion by refusing to submit instructions concerning specific pleaded acts of negligence). Submission of such instructions would be contrary to the Texas Supreme Court's pronouncement in *Lemos:*

We have learned from history that the growth and proliferation of both instruc-

tions and issues come one sentence at a time. For every thrust by the plaintiff for an instruction or an issue, there comes a parry by the defendant. Once begun, the instructive aids and balancing issues multiply. Judicial history teaches that broad issues and accepted definitions suffice and that a workable jury system demands strict adherence to simplicity in jury charges.

680 S.W.2d at 801. Such a holding would likewise be contrary to the Texas Supreme Court's express warning in *Harris County* that "[n]either our decision today nor *Casteel* is a retrenchment from our fundamental commitment to broad-form submission." *Harris County,* 96 S.W.3d at 235. We decline to expand the supreme court's holdings in *Casteel* and *Harris County* by applying them to require submission of limiting instructions concerning specific pleaded negligent acts within a single broad-form submission of a negligence theory of liability.

Also in their second issue, Appellants assert that a *Casteel/Harris County* charge error exists concerning the trial court's submission of malice. Specifically, Appellants claim that the trial court instructed the jury on two different theories whereby malice could be attributed to the Medical Center: acts with malice by a vice principal or ratification by a vice principal of the acts taken with malice. The Medical Center claims *no evidence* exists to support submission of the ratification theory for imputing malice and that, consequently, its submission created *Casteel/Harris County* charge error.

Based on our review of the record, legally sufficient evidence exists that Nurse Heskes ratified the administration of Verapamil to Scott by Johansen. Nurse Heskes admitted that she supervised Johansen, that she knew he had a serious question about the propriety of Verapamil

for Scott, that she had a duty to intervene under the circumstances, that she had plenty of time to intervene, that she said nothing and allowed the Verapamil to be administered, and that she may have breached her duty by failing to intervene. A member of the Medical Center's administration with the authority to manage all nurses and paramedics at the Medical Center personally observed the events leading to the administration of Verapamil and failed to intervene. This is more than a scintilla of evidence supporting submission of ratification as a basis for imputing malice to the Medical Center. *See, e.g., Lee Lewis,* 70 S.W.3d at 786 (upholding jury's gross negligence finding when "C.L. Lewis admitted that even after observing KK Glass' ineffective fall-protection system, *he did nothing* to remedy it") (emphasis added); *Ellender,* 968 S.W.2d at 922 (recognizing that a corporation is liable for gross negligence through the actions *"or inactions"* of a vice principal) (emphasis added); *see also Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 619 (Tex.App.-Waco 2000, pet. denied) (recognizing corporation is liable "if it acts maliciously through the actions of a corporate officer" and noting that officer acted maliciously *by failing to explain* true nature and terms of construction loan). Because legally sufficient evidence exists supporting ratification as one ground for imputing malice to the Medical Center, no *Casteel/Harris County* error was created by submission of ratification.

■■■ Next, the Medical Center argues that the trial court's instruction concerning ratification was legally incorrect. Explanatory instructions should be submitted when, in the sole discretion of the trial court, they will help the jurors understand the meaning and effect of the law and the presumptions the law creates. *Pitts v. Sabine River Auth. of Tex.,* 107 S.W.3d

811, 819 (Tex.App.-Texarkana 2003, pet. filed). The trial court is given wide latitude to determine the propriety of explanatory instructions and definitions. *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 256 (Tex.1974); *see also Ishin Speed Sport v. Rutherford,* 933 S.W.2d 343, 350 (Tex. App.-Fort Worth 1996, no writ) (recognizing trial courts are given considerably more discretion in submitting instructions and definitions than in submitting questions). Moreover, a trial court may personalize or individualize a charge to the facts of the case so the jury can more easily understand the law. *Rutherford,* 933 S.W.2d at 350.

■■ Here, the trial court instructed the jury that in order for the Medical Center to have acted with malice it must have acted through a vice principal or "the employer or a manager of the employer [must have] ratified or approved the act. A ratification may occur when the employer or its vice principal confirms, adopts, or fails to disagree with the acts of an employee." The Medical Center contends that the "fails to disagree" language is legally incorrect; however, this is a legally correct definition of when malice may be imputed to a corporation through ratification. *See, e.g., Lee Lewis,* 70 S.W.3d at 786 (recognizing corporation's liability for gross negligence based on vice principal conduct in doing "nothing to remedy it"); *Ellender,* 968 S.W.2d at 922 (recognizing corporation's liability for gross negligence may be based on "inactions" of a vice principal); *Plunkett,* 27 S.W.3d at 619 (recognizing corporation's liability for gross negligence based on vice principal's action in "failing to explain the true nature and terms of the construction loan"). Therefore, the trial court did not abuse its discretion in submitting the ratification definition. We overrule Appellants' second issue.

## V. FAILURE TO FIND THE DOCTORS NEGLIGENT

■ In their fourth issue, Appellants contend that the jury's failure to find Dr. Zeh and Dr. Osborne negligent is wholly contradictory to its findings that the Medical Center and Nurse Crain were negligent. This complaint is not preserved for our review because Appellants did not raise any contention concerning conflicting jury findings before the jury was discharged. *See, e.g., Norwest Mortgage, Inc. v. Salinas,* 999 S.W.2d 846, 865 (Tex. App.-Corpus Christi 1999, pet. denied) (holding that to preserve error, appellant must object to conflict in jury findings before jury is discharged).

■ Appellants also assert in their fourth issue that the jury's failure to assess negligence against Drs. Zeh and Osborne was against the great weight and preponderance of the evidence. The jury, however, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638, 641, 358 S.W.2d 547, 549 (1962). The jury may believe one witness and disbelieve another and resolve inconsistencies in any testimony. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). This court cannot substitute its opinion for that of the trier of fact and determine that it would have weighed the evidence differently or reached a different conclusion. *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

Here, the jury did not fail to find Drs. Zeh and Osborne negligent. The jury failed to find that "the negligence, if any, of [Dr. Zeh and Dr. Osborne] proximately caused the occurrence in question." The jury could have believed that, although Dr. Zeh and Dr. Osborne were negligent, it was the negligence of Nurse Crain and the Medical Center that proximately caused the occurrence in question: the administration of the Verapamil by Johansen. The jury could have inferred that if Nurse Crain and Johansen had refused to participate in the administration of Verapamil to Scott, or if Nurse Heskes had questioned Dr. Zeh's order, then the occurrence in question, the administration of Verapamil, would not have occurred.

Additionally, the jury could have believed Dr. Osborne's testimony that he never told Dr. Zeh to administer Verapamil to Scott and could have therefore concluded that Dr. Osborne was not negligent. The jury could have believed Dr. Zeh's testimony that she thought Dr. Osborne told her to administer Verapamil to Scott. The jury could have concluded that Dr. Zeh's reliance on information provided by a consulting cardiologist rendered her order for Verapamil nonnegligent. Evidence exists which the jury could have believed and concluded that Drs. Zeh and Osborne properly exercised the degree of care that an emergency room doctor and a cardiologist of ordinary prudence, respectively, would have exercised under the same or similar circumstances. We cannot agree that the jury's failure to find that the negligence of Drs. Zeh and Osborne proximately caused the occurrence in question is against the great weight and preponderance of the evidence. We overrule Appellants' fourth issue.

## VI. JURY ARGUMENT

In their seventh issue, Appellants complain that a comment made by Scott's counsel during opening statements concerning Scott's settlement with Drs. Zeh and Osborne was improper. Appellants failed to lodge a contemporaneous objection to the comments they complain about on appeal. Instead, they waited until the conclusion of Scott's counsel's opening statement and then moved for a mistrial.

The trial court denied the motion for mistrial, and Appellants did not request an instruction to the jury to disregard the comment. Consequently, Appellants argue that the comments here were incurable by a jury instruction and require the granting of a new trial, despite the lack of a contemporaneous objection and the lack of a request for an instruction to disregard.

■■■ Incurable jury argument occurs when comments are so inflammatory that their harmful nature cannot be cured by an instruction to disregard. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Kwiatkowski,* 915 S.W.2d 662, 664 (Tex.App.-Houston [14th Dist.] 1996, no writ.) There are only rare instances of incurable harm from improper argument. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Although an offer in compromise and settlement is inadmissible as evidence, error in informing a jury of a settlement can be cured by an instruction to disregard. TEX.R. EVID. 408; *Beutel v. Paul,* 741 S.W.2d 510, 513–14 (Tex.App.-Houston [14th Dist.] 1987, no writ); *Parks v. Benson Co., Builders,* 393 S.W.2d 700, 703 (Tex.Civ.App.-Fort Worth 1965, writ ref'd n.r.e.). Therefore, the error here could have been cured by an instruction to disregard the comments concerning the doctors' settlement with Scott. *See Beutel,* 741 S.W.2d at 513–14; *Parks,* 393 S.W.2d at 703. Because Appellants did not request an instruction to disregard, their complaint is not preserved for our review. *See, e.g., State Bar v. Evans,* 774 S.W.2d 656, 658 (Tex.1989) (holding that failure to request an instruction to disregard waives error where instruction would

have cured error). We overrule Appellants' seventh issue.

## VII. MEDICAL EXPENSES

■■■ In their sixth issue, Appellants contend that they are entitled to an offset from the jury's award to Scott for past medical expenses. Specifically, Appellants claim they should be held responsible only for Scott's past medical expenses that were actually paid by Medicaid. Appellants, however, failed to plead an offset. The right of offset is an affirmative defense. TEX.R. CIV. P. 94. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion. *Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). Regardless of the merits of Appellants' argument that they are entitled to an offset, because they did not plead the affirmative defense of offset, this issue is waived. *See id.*

Also under their sixth issue, Appellants argue that the evidence is legally and factually insufficient to support the jury's award to Scott of ten million dollars for his future medical expenses.[10] Appellants contend that Scott was required to introduce expert testimony proving his life expectancy and future medical expenses within a reasonable medical probability. Scott, on the other hand, contends that neither his life expectancy nor his projected future medical expenses require expert testimony to a reasonable medical probability.

■■■ To recover for future medical expenses under Texas law, the plaintiff must show there is a "reasonable probability" that such medical expenses will be

---

**10.** The jury awarded the following damages: $10,000,000 future medical expenses; $140,000 loss of past earning capacity; $0 loss of future earning capacity; $0 past physi- cal pain; $0 future physical pain; $0 past physical impairment; $0 future physical impairment; and $3,000,000 punitive damages.

incurred in the future. *Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 191 (Tex.App.-Corpus Christi 2002, no pet.). The plaintiff is not required to prove future medical expense based on "reasonable medical probability." *Furr's, Inc. v. Logan*, 893 S.W.2d 187, 194 (Tex.App.-El Paso 1995, no writ). The court in *Furr's, Inc.* rejected the exact proposition raised by Appellants here:

> Furr's next urges that the jury's award for future medical care must be set aside because there is no evidence, based upon reasonable medical probability, as to the amount of money necessary to furnish Ms. Logan with future medical care. This is not the standard for determining future damages in personal injury cases. Texas follows the "reasonable probability" rule for future damages, including future medical expenses. *City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex.App.-San Antonio 1988, writ denied); *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex.App.-Amarillo 1981, writ ref'd n.r.e.). The jury may make its award for future medical care based upon the nature of plaintiff's injuries, medical care rendered before trial, and the plaintiff's condition at the time of trial. [*Hughett*, 624 S.W.2d at 405.] Plaintiff is not required to establish the future medical consequences of her injury by expert testimony based on reasonable medical probability.

*Id.* at 194; *see also Pipgras v. Hart*, 832 S.W.2d 360, 366 (Tex.App.-Fort Worth 1992, writ denied) (holding "[n]o precise evidence is required to support an award of future medical damages"). Although the preferred practice to establish future medical expenses is through expert medical testimony, no rule exists requiring that the plaintiff establish such expenses through expert testimony. *Furr's, Inc.*, 893 S.W.2d at 194; *Thate v. Tex. & Pac. Ry. Co.*, 595 S.W.2d 591, 601 (Tex.Civ. App.-Dallas 1980, writ dism'd). Thus, an award of future medical expenses lies largely within the discretion of the jury. *See Brownsville Pediatric Ass'n*, 68 S.W.3d at 192.

■ Likewise, Scott was not required to prove his life expectancy to a reasonable medical probability. In fact, such a burden of proof is impossible because life expectancy, by its very nature, is uncertain. *Pipgras*, 832 S.W.2d at 365 (recognizing "life expectancy, medical advances, and the future cost of products, services[,] and money are not matters of certainty"). The trial court admitted the life expectancy tables into evidence. Appellants lodged no objection. Those tables show, and Dr. Allen Self testified, that a full life expectancy for Scott would be 78.33 years. Dr. Robert Shavelle testified that Scott's life expectancy was 8.1 years. Dr. Shavelle conceded that Scott could live longer than 8.1 years or less than 8.1 years and agreed that he could not predict when Scott would die because "no one can predict how long anyone will live. No one knows—no man knows the day or the hour." Thus, we decline to hold, as Appellants urge, that Scott was required to prove his life expectancy to a reasonable medical probability.

The nature of Scott's injuries was not disputed. The evidence conclusively established that Scott has an anoxic brain injury from which he will not recover. Appellants' expert testified that Scott's "physical disability will continue." Scott cannot speak or care for himself, has a tracheostomy and a feeding tube, has no bladder control, and is incontinent.

Scott's current treating doctor, Dr. Garry Pearson, testified concerning Scott's medical care rendered before trial, Scott's condition at the time of trial, and the type of treatment Scott should have in the fu-

ture. Scott resides in Four Seasons Nursing Home, but has been hospitalized at a local hospital three or four times for dental care, urosepsis, urinary tract infections, pneumonia, and sepsis. Scott has experienced several skin ulcers while he has been at Four Seasons, and he suffers from muscle contractures. Dr. Pearson testified that the Four Seasons was a geriatric facility for the most part and that, based upon a reasonable medical probability, Scott required a higher level of care than the geriatric patients at the Four Seasons. Dr. Pearson opined that the staff at Four Seasons did not have adequate time to work with Scott's contractures and that, based on a reasonable medical probability, Scott "would be better suited in a facility that took care of patients that have Scott's condition routinely."

Dr. Terry Winkler, who is a medical doctor board certified in physical medicine and rehabilitation and is a certified life care planner, reviewed Scott's medical records, examined Scott, visited with Scott's mother, Norma, and visited with Dr. Pearson. He prepared two different life care plans for Scott outlining Scott's future needs. These needs include on-going nursing care, physical therapy, a whirlpool to treat his skin ulcers, a suction machine, and other equipment and services.

Dr. Self, an economist, used Dr. Winkler's life care plan to project the future medical expenses associated with Scott's care. Dr. Self testified that Scott's future medical expenses would range between $7.2 million and $19.7 million depending on Scott's life span and the level of care provided. The jury awarded Scott $10 million for future medical expenses.

■ Viewing only the evidence and inferences tending to support the jury's future medical expenses award and disregarding all evidence and inferences to the contrary, we hold that the evidence is legally sufficient to support the jury's award of $10 million for Scott's future medical expenses. *See Bradford,* 48 S.W.3d at 754; *Brownsville Pediatric Ass'n,* 68 S.W.3d at 192; *Furr's, Inc.,* 893 S.W.2d at 194; *Pipgras,* 832 S.W.2d at 366. Further, considering all of the evidence, the evidence supporting the jury's future medical expense award is not so weak, nor is the evidence to the contrary so overwhelming, that the answer should be set aside and a new trial ordered. *See Garza,* 395 S.W.2d at 823; *Brownsville Pediatric Ass'n,* 68 S.W.3d at 192; *Furr's, Inc.,* 893 S.W.2d at 194; *Pipgras,* 832 S.W.2d at 366. We overrule Appellants' sixth issue.

## VIII. PRE-JUDGMENT AND POSTJUDGMENT INTEREST

In a postsubmission brief, Appellants assert that the judgment should be reformed to reflect a 5% pre and postjudgment interest rate. The judgment was signed on June 26, 2002, and Appellants filed their notice of appeal on September 20, 2002. Almost a year later, the 78th Legislature amended the Texas Finance Code to reduce the postjudgment interest rates from 10% per year to "the prime rate as published by the Federal Reserve Bank of New York on the date of computation" or should the prime rate fall below 5%, to 5% per year.[11] The amendments apply to a final judgment that is "signed or subject to appeal on or after the effective date of this Act." TEX. FIN.CODE ANN. § 304.003 (Vernon Supp.2004).

11. Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, sec. 304.003(c), 2003 Tex. Gen. Laws 2096, 2096–97 (amended 2003) (current version at TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2004)).

Appellants contend that because their appeal was pending in this court when the amendments to finance code section 304.003(c) became effective, the judgment is "subject to an appeal on or after the effective date" of the legislation and the new postjudgment interest rate should apply. They then argue that because existing section 304.103 of the Texas Finance Code provides that the pre-judgment interest rate is equal to the postjudgment interest rate applicable at the time of the judgment, the judgment's prejudgment interest rate should also be changed to 5%. *See id.* § 304.103.

Statutory interpretation is a question of law. *In re Canales,* 52 S.W.3d 698, 701 (Tex.2001) (orig. proceeding). Our primary goal is to ascertain and effectuate the legislature's intent. *Bragg v. Edwards Aquifer Auth.,* 71 S.W.3d 729, 734 (Tex. 2002). In doing so, we begin with the statute's plain language because we assume that the legislature tried to say what it meant and, thus, that its words are the surest guide to its intent. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865–66 (Tex.1999). We presume the legislature intended a just and reasonable result in enacting a statute. *In re D.R.L.M.,* 84 S.W.3d 281, 290 (Tex.App.-Fort Worth 2002, pet. denied).

■ The plain language of the amendments to section 304.003(c) provides that they apply to judgments "signed or subject to an appeal on or after the effective date of the Act." The plain meaning of the phrase "subject to an appeal" when used to describe a judgment traditionally means that the judgment fully and finally disposes of all parties and all issues before the trial court and therefore is capable of being appealed. *See, e.g., Law Offices of Windle Turley, P.C. v. French,* 109 S.W.3d 599, 600 (Tex.App.-Dallas 2003, no pet.) ("In this case, we must determine whether a judgment that fails to dispose of a 'counterclaim for filing a frivolous lawsuit' is a final judgment *subject to appeal.*") (emphasis added); *Hartford Underwriters Ins. Co. v. Hafley,* 96 S.W.3d 469, 475 (Tex.App.-Austin 2002, no pet.) ("Thus, the final judgment of the district court, although *subject to appeal,* was final for purposes of the attorney's fees provision of the Act.") (emphasis added); *Saavedra v. Schmidt,* 96 S.W.3d 533, 550 n. 16 (Tex.App.-Austin 2002, no pet.) ("If the orders were indeed temporary orders, as opposed to a final order denying Saavedra's petition to enforce a child custody determination, those orders are not *subject to appeal.*") (emphasis added); *Qualia v. Qualia,* 37 S.W.3d 128, 129 (Tex.App.-San Antonio 2001, no pet.) ("Accordingly, we hold the issuance of a Request for International Judicial Assistance under the circumstances present here is not *subject to appeal.*") (emphasis added); *Jordan v. Jordan,* 36 S.W.3d 259, 262 (Tex.App.-Beaumont 2001, pet. denied) ("The Supreme Court found the trial court's judgment in the bill of review action was interlocutory and not *subject to appeal* because the order did not dispose of the case on the merits.") (emphasis added). Thus, giving the statutory language its plain meaning, the amendments to finance code section 304.003(c) apply to cases where a judgment is signed on after the effective date of the Act and to cases where a judgment becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act.

For example, a default judgment against one of several defendants that was signed before the effective date of the amendments would nonetheless be subject to the new postjudgment interest rate if a severance order was entered, severing out the plaintiff's claims against the defaulting

**866**

party, after the amendments became effective. Following the severance order, the default judgment would be subject to an appeal, i.e., would be capable of being appealed. Thus, the amendments would apply to the severed default judgment.

When we interpret a statute we may also consider the legislative history of the statute and we must presume that the statute operates only prospectively unless it is expressly made retrospective. TEX. GOV'T CODE ANN. § 311.022, .023 (Vernon 1998). Here, the legislative history concerning the amendments expressly indicates that they apply prospectively. SENATE COMM., BILL ANALYSIS, Tex. H.B. 4, 78th Leg., R.S. (2003); SENATE COMM., BILL ANALYSIS, Tex. H.B. 2415, 78th Leg., R.S. (2003).

For these reasons, we cannot agree with Appellants that the amendments' subject-to-an-appeal language actually means pending on appeal and that, therefore, the amendments apply retroactively. Such a construction would mandate a recalculation of postjudgment interest in every single civil case involving a money judgment pending on appeal in all fourteen courts of appeal as of June 20, 2003. We decline to adopt this construction in light of the plain language of the amendments, the indication in both Acts' bill analysis that the amendments apply prospectively, and the consequences of a contrary construction. *See D.R.L.M.*, 84 S.W.3d at 290 (recognizing that we will not construe a statute in a manner leading to a foolish result when another alternative construction was more probably intended).

## IX. CONCLUSION

Having overruled all of Appellants' issues and having addressed the arguments raised in Appellants' post-submission brief, we affirm the trial court's judgment.