COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-313-CV

 

 

HYDE-WAY, INC. AND CHARLES                                         APPELLANTS

GLEN HYDE

 

                                                   V.

 

JOHN R. DAVIS                                                                     APPELLEE

 

                                              ------------

 

            FROM THE 362ND
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                            Introduction








Appellants Hyde-Way, Inc. (Hyde-Way) and Charles
Glen Hyde (Hyde) appeal from the jury=s
verdict and the trial court=s
judgment awarding appellee John R. Davis various types of damages for his
assault claim.  In eight issues,
appellants argue (among other contentions) that the trial court erred by
submitting portions of its charge to the jury and that there is no evidence to
support the jury=s answers to some of the
questions in the charge.  We affirm.

                                        Background
Facts

Hyde-Way, a business that Hyde and his wife
(Candace) incorporated as sole shareholders in 1980,[2]
has operated a portion of the Northwest Regional Airport (the Airport)[3]
since at least 1983.  Hyde-Way
constructed and owns hangars at the Airport, and it previously owned the
Airport=s
runway.  Hyde is the president of
Hyde-Way and Candace is its secretary-treasurer.

Hyde and Candace live at the Airport in a hangar.  Hyde has a history of blocking car and
aircraft access to the Airport=s
taxiways.[4]








Davis bought a hangar at the Airport in 1990
through a foreclosure sale; he intended to use it as a residence and also for a
helicopter maintenance business.  Davis
also bought two 7,500‑square‑foot lots that adjoined the 6,000‑square‑foot
hangar and a one‑acre lot that was not adjacent to the hangar.  He needed to use a taxiway to give his
customers access to his hangar.  Davis
paid taxiway dues of $456 per year from 1990 to at least 1999.[5]  On two occasions between 1990 and 1996, Hyde
offered to sell the grass taxiway to Davis for one dollar if Davis paid to pave
it.

Hyde and Davis eventually had a dispute about
access to the taxiway; Hyde has not allowed any access from Davis=s hangar
to the taxiway since 2000.  On April 7,
2004, stemming from their taxiway dispute, Hyde and Davis exchanged words while
they were in their respective vehicles.[6]








A week later, on a Sunday evening, Hyde stopped
his pickup truck in the middle of a narrowly paved road near the Airport and
Davis=s house,
loudly exchanged angry words with Davis,[7]
walked about twenty feet quickly toward Davis as Davis also moved toward him
through a grassy area between the road and his house (located on the one-acre
lot he had purchased), and punched Davis in his face two or three times as
Davis tried to retreat.[8]  Hyde returned to his truck and drove away;
Davis, while holding a tooth in his hand and with his mouth bloodied from the
encounter, walked to strangers in a car who had witnessed the assault and asked
them to stay as he called the police. 
The driver of the car left but gave Davis his phone number, and the
driver later gave a statement to law enforcement and testified in the trial of
this case.

Davis then walked into his house, and his wife
called 911.  When Davis first spoke to
the 911 responder, he said he did not need an ambulance because he was Atrying
to be tough.@ 
About fifteen minutes later, Davis called 911 again and asked for an
ambulance.








As Davis waited for an ambulance, his wife took
some pictures of his injuries.[9]  The ambulance arrived, and then paramedics
placed Davis on a stretcher and took him to a hospital in Grapevine.  At the hospital, Davis received advice that
he contact his dentist.  Later that
night, the hospital released him, and he gave a statement about Hyde=s
assault to the police.

Davis went to his dentist two days later and
learned that two of his teeth had been fractured.  The dentist made temporary crowns for
aesthetic purposes, and then the dentist referred Davis to a periodontist (a
dental specialist) to restore the teeth through a crown-lengthening procedure.[10]  Davis had two or three more appointments
with the dentist over the course of several months and three appointments with
the periodontist for further work that took several hours to complete.  Davis=s
appointments with his dentist cost over $3,400; his appointments with his
periodontist cost approximately $800.[11]








In February 2003, Davis and his wife filed an
original petition that contained assault and trespass claims and alleged that
Hyde and Hyde-Way were both responsible to pay exemplary damages and economic
and noneconomic damages related to Davis=s
medical expenses, pain and suffering, loss of consortium, and lost wages.[12]  That same year, through a realtor, Davis
listed his three parcels of property near the Airport for sale.  He sold the one-acre lot where his home was
located, but he did not sell the other lots because, among other reasons,
access to the taxiways, which were owned by Hyde=s
company, had been blocked by Hyde with several truckloads of trash, asphalt,
and dirt,[13]
meaning that there was no access to the taxiways except through an agreement
with Hyde.[14]  Davis=s
realtor placed signs on the property, but someone repeatedly destroyed or stole
the signs, and Davis eventually chose to take the lots off of the market.








In a related criminal trial, a jury convicted
Hyde in March 2006 for the assault on Davis. 
In May 2006, Davis filed a traditional motion for partial summary
judgment, contending that Hyde=s
criminal conviction for assault precluded his ability to prevail on that claim
in Davis=s case
against him.[15]  After Hyde did not respond to the motion, the
trial court granted it (as against Hyde individually) and decreed that Hyde was
liable for assaulting Davis.

The jury trial on the parties=
remaining claims began in April 2008.  At
trial, during his opening statement to the jury, Davis=s
counsel related that the basis of Davis=s case was
that during Hyde=s assault of Davis, Hyde was
acting in furtherance of Hyde-Way; he also contended that Hyde and Candace are Aprofessionals
. . . at the corporate shell game.@  Hyde-Way=s
counsel asserted that Davis was a Aliar@ and a Aperpetrator
of a fraud@ who Aphonied
up a deal@ to get money.








Davis testified that he had not incurred any
damages since the time of Hyde=s
criminal trial.  He also testified that
he could not recall why he sued Hyde-Way; he stated, Athat=s
something [Davis=s attorneys] decided after we
told them what had happened.@  When asked what Hyde-Way does, Davis
responded that he Abelieve[d] they=re in
the real estate business@ and that such information is A[s]ecretive
between all [Hyde=s] corporations.@  He reiterated his belief, however, that
when Hyde assaulted him, he was on Airport patrol because A[e]verything
that happens on the [A]irport happens through Glen Hyde,@
although he admitted that his belief was speculative.

Candace testified that although Texas Air
Classics collects licensing fees for use of the Airport=s
taxiways, Hyde-Way is the enforcer of the fees. 
And she admitted that she typed a letter to law enforcement about Hyde=s
assault of Davis that is signed by Hyde in his capacity as president of
Hyde-Way and that is printed on Hyde-Way letterhead.  The letter, dated December 12, 2002, states,

Dear Sheriff Lucas,

 

On November 14, 2002, at approximately 3:30 P.M., [Davis] trespassed
on my property.  I have advised [Davis]
to stay off my [A]irport property on numerous occasions, but he continues to
trespass, as well as antagonize, use profanity, hand signals, etc.  [Davis] has a long[‑]standing history
(over eight years) of this type of conduct witnessed by numerous people.

 

Last April 14th, [Davis] assaulted me while I was in my vehicle on a
Denton County Road that runs in front of his house.  In order to defend myself, I exited the truck
and a fist fight ensued in which [Davis] received a couple of smacks to the
head and a swift kick to his posterior. 
After waiting two weeks, [Davis] elected to file a complaint with [law
enforcement]. . . .








This whole matter took place in the middle of a county road.  I never went onto [Davis=s] property, which
clearly proves [Davis] assaulted me. . . . 
If the Sheriff=s Department ever wants
to arrest me, all they have to do is come by my office 9 A.M.‑5 P.M.,
Monday‑Friday at Northwest Regional Airport, where I=ve worked and resided for
over twenty years!  However, in
consideration of [Davis=s] and my long[‑]standing
personality differences[,] I feel it=s in our mutual benefit and best interest if
[Davis] doesn=t come anywhere on my
[A]irport property.  Please advise
[Davis] not to come on my property as soon as possible.  I=ve enclosed an [A]irport map showing [Davis=s] property and the
[A]irport property. . . . [O]ur office can=t find any written license agreement authorizing
[Davis] or [his] tenants or guests access to Northwest Regional Airport. . . .

 

. . . .

 

Sincerely,

 

[][16]    

 

Glen Hyde, President

 

Candace said that it has been Ayears@ since
Hyde-Way has paid her or Hyde any salary. 
When asked whether Hyde-Way did business in 2002, she responded, ANot
really,@ but
this conflicts with her testimony that Hyde-Way had a part-time employee in
that same year.  She testified that Hyde
was not working for Hyde-Way on the night of the assault.  Finally, she stated that (as asserted in
Hyde-Way=s letter
to law enforcement) Davis has trespassed on her property and that Davis is
aggressive and a Avery scary fellow.@








After Davis rested his case, Hyde-Way moved for a
directed verdict on Davis=s whole case against it, and
Hyde moved for a directed verdict on Davis=s
request for exemplary damages; the trial court denied both motions.  Neither Hyde nor Hyde-Way called any
witnesses.

At the jury charge conference, all parties
requested various additions or made objections. 
The parties presented their closing arguments, and then the jury
deliberated and returned its verdict for Davis=s
assault claim.[17]  Appellants jointly filed a motion for
judgment notwithstanding the verdict or for a new trial, contending that there
is no evidence to support several of the jury=s
answers; following a hearing, the court denied these motions.

In its judgment, based on the jury=s
verdict, the trial court assessed the amount of damages plus prejudgment
interest at $156,918.72, and it also assessed postjudgment interest until that
amount is paid.  Appellants filed this
appeal, asking us to reverse the trial court=s
judgment and render a take-nothing judgment.

                          Hyde-Way=s
Liability for Hyde=s Assault








In their first four of eight issues, appellants
assert that Hyde-Way should not be liable for Hyde=s
assault because there is no evidence to support three of the jury=s
answers and because the trial court erred by refusing to include a requested
definition in the jury charge. 
Specifically, they argue that the trial court erred by not including in
the definition of Aemployee@ the
phrase Aand who
is compensated for his servicesA and
that there is no evidence to support the jury=s
affirmative responses to (1) question number one, which asked, AIs
[Hyde-Way] responsible for the conduct of [Hyde]?@; (2)
question number two, which asked, AOn the
occasion in question[,] was [Hyde] acting as an employee of [Hyde-Way]?@; and
(3) question number three, which asked, AOn the
occasion in question[,] was [Hyde] acting in the scope of his employment?@  Appellants do not challenge the factual
sufficiency of the evidence, and they do not challenge the wording of the jury
questions except for the definition of Aemployee,@ as
described above.

Standard of review

A challenge that there is no evidence to support
a jury=s
finding is a challenge to the legal sufficiency of the evidence.  See Exxon Corp. v. Emerald Oil & Gas
Co., No. 05‑1076, 2009 WL 795668, at *6 (Tex. Mar. 27, 2009); Solutioneers
Consulting, Ltd. v. Gulf Greyhound Partners, 237 S.W.3d 379, 389 n.9 (Tex.
App.CHouston
[14th Dist.] 2007, no pet.).  Hyde-Way
and Hyde acknowledge that they are challenging the legal sufficiency of the
evidence to support the jury=s
findings.








We may sustain a legal sufficiency challenge only
when (1) the record discloses a complete absence of evidence of a vital fact,
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (4) the evidence
establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999); W.L.
Lindemann Operating Co. v. Strange, 256 S.W.3d 766, 774 (Tex. App.CFort
Worth 2008, pet. denied).








In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v.
Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005). 
Anything more than a scintilla of evidence is legally sufficient to
support the finding.  Cont=l Coffee
Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v.
Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). 
More than a scintilla of evidence exists if the evidence furnishes some
reasonable basis for differing conclusions by reasonable minds about the
existence of a vital fact.  Rocor Int=l, Inc.
v. Nat=l Union Fire Ins. Co., 77
S.W.3d 253, 262 (Tex. 2002).

Issue one, concerning jury question number one

In the first question of the jury charge, the
trial court asked the jury, AIs [Hyde-Way]
responsible for the conduct of [Hyde]?@  The court then instructed the jury that
Hyde-Way is responsible for Hyde=s
conduct if it was 

organized and operated as
a mere tool or business conduit of [Hyde] and there was such unity between
[Hyde-Way and Hyde] that the separateness of [Hyde-Way] had ceased and holding
only [Hyde] responsible would result in injustice.

 

In deciding whether there was such unity . . ., you are to consider
the total dealings of [Hyde-Way and Hyde], including:

 

1.     the
degree to which [Hyde-Way=s] property had been kept
separate from that of [Hyde];

 

2.     the
amount of financial interest, ownership, and control [Hyde] maintained over
[Hyde-Way];

 

3.     whether
[Hyde-Way] had been used for personal purposes of [Hyde]; and,

 

4.     [Hyde]
used [Hyde-Way] as a means of evading an existing legal obligation, and holding
only [Hyde] responsible would result in injustice.

 








The Abusiness
conduit@ and Aunity@ terms
and the four factors described in the jury charge relate to the Aalter
ego@ theory
of piercing the corporate veil to justify holding the shareholders of a
corporation liable for a corporation=s
acts.  See Castleberry v. Branscum,
721 S.W.2d 270, 272 (Tex. 1986), superseded by statute as stated in Willis
v. Donnelly, 199 S.W.3d 262, 271B72 &
n.12 (Tex. 2006); Seidler v. Morgan, 277 S.W.3d 549, 557 (Tex. App.CTexarkana
2009, pet. denied); Schlueter v. Carey, 112 S.W.3d 164, 169 (Tex. App.CFort
Worth 2003, pet. denied).  The trial court
inversely used the factors to allow the jury to hold a corporation
(Hyde-Way) liable for an individual=s (Hyde=s)
actions.  Although this portion of the
jury charge may therefore be defective, Ait is
the court=s charge, not some other
unidentified law, that measures the sufficiency of the evidence when the
opposing party fails to object to the charge.@  Osterberg v. Peca, 12 S.W.3d 31, 55
(Tex.), cert. denied, 530 U.S. 1244 (2000); see City of Fort Worth v.
Zimlich, 29 S.W.3d 62, 71 (Tex. 2000); Kroger Co. v. Brown, 267
S.W.3d 320, 323 (Tex. App.CHouston
[14th Dist.] 2008, no pet.).  Thus, we
must use the charge=s language and its factors to
determine Hyde-Way=s liability, even if the
language and the factors would not otherwise be relevant to that determination.








For similar reasons, we cannot consider the
effect of section 21.223 of the business organizations code, which appellants
cite as their principal support in arguing that the Aalter
ego@ theory
that is described in question number one has been negated by the legislature.[18]  See Tex. Bus. Orgs. Code Ann. ' 21.223
(Vernon 2008).  Neither Hyde-Way nor Hyde
raised section 21.223 in the trial court or argued in that court that question
number one had been improperly submitted for any reason other than that there
was no evidence to support it.  Thus,
even if that section does negate the alter ego theory as submitted in question
number one, we must still measure the sufficiency of the evidence under the
standards submitted in that question.  See
Osterberg, 12 S.W.3d at 55.

Almost all of appellants= first
issue focuses on section 21.223; they only briefly contend that there is Asimply
no evidence to support the jury=s answer
to Question No. 1 that [Hyde-Way] was responsible for the conduct of Hyde.@  They do not provide any analysis of the
record in the briefing on their first issue, and they do not cite any legal
authorities that are unrelated to their contention regarding section 21.223,
but we must still address the legal sufficiency of the evidence supporting
question number one.  See City of
Arlington v. State Farm Lloyds, 145 S.W.3d 165, 167B68 (Tex.
2004).








We believe that there was at least more than a
scintilla of evidence presented at trial from which the jury could decide that
Hyde and Hyde-Way were so unified in the events related to the assault that
their separate identities ceased and that holding only Hyde responsible would
be unjust.  See Uniroyal Goodrich
Tire Co., 977 S.W.2d at 334.  As
described, Hyde mixed and equated his dispute with Davis (which he now claims
to be only personal) and his then-pending personal criminal prosecution with
his Hyde-Way business operations by signing a letter on Hyde-Way=s
letterhead, as its president, detailing his version of the assault (which was
belied by the evidence at trial).  In
that letter, Hyde said that he could be arrested at his office, where he had Aworked
and resided for over twenty years[.]@  He further entangled his dispute with Davis
with Hyde-Way=s business in the letter by
asking the sheriff to advise Davis Anot to
come on [his Airport] property as soon as possible,@ by
stating that his office could not find any document authorizing Davis to be
there, and by expressing his feeling that it was urgent that the sheriff=s office
Asupport
this request for legal separation and restraint.@

Next, as is described in more detail below, Hyde=s words
to Davis a week before the assault, when he talked about the taxiway issue and
stated that he was going to run Davis off of the Airport, further connected
Hyde-Way=s
functions to Hyde=s personal dispute with
Davis.  Hyde=s
personal life and his business ventures also merge because he lives in a hangar
at the Airport.








Furthermore, the record reflects Hyde-Way=s loose
structure, which creates difficulties in separating Hyde-Way=s
actions from Hyde=s actions.  In its more than twenty-eight years of
existence, Hyde-Way has never been owned by anyone other than Hyde or Candace;
the corporation has also never had any other officers or directors.  When asked whether Hyde-Way has a
vice-president, Candace testified, ANo,
sir.  Or if we do, then it would probably
just fall to me.@ 
And although Candace is Hyde-Way=s sole
shareholder, she expressed unfamiliarity with the process of the corporation=s
shareholder meetings, stating, AI think
you have to have like shareholders elect directors and all that kind of
stuff.  And [Hyde], being one of the
directors, I think, has to be there.@  She expressed similar unfamiliarity with how
Hyde-Way would pay salaries.








Although the evidence related that Hyde does not
own Hyde-Way stock anymore because Candace owns it all,[19]
there was no testimony indicating that Hyde does not indirectly financially
benefit from Candace=s ownership of the stock or from
the money the corporation makes.  And the
jury could have inferred that Hyde=s
finances were tied to Hyde-Way=s
finances because they heard admissions demonstrating that both Hyde=s and
Hyde-Way=s net
worth is Ain excess of $600,000.@  See City of Keller, 168 S.W.3d at 821B22
(explaining that a jury may draw inferences from the evidence).

Also, as president, Hyde clearly had control over
Hyde-Way=s
activities, as is admitted by Hyde-Way in its brief.  Davis expressed his belief that Hyde controls
Hyde-Way, testifying without objection, AAll the
corporations are Glen Hyde.  There=s no
difference in any of them.@  The idea that Hyde=s
various corporations exist as an extension of each other and himself has some
support in the record.  For instance,
Hyde or Candace own a corporation called Dream Ships that exists only to own an
airplane that it purchased through a note from the Hydes.  Also, Hyde-Way and Texas Air Classics share
the same office space, phone number, and address.








We conclude and hold that the collective evidence
presented at trial, viewed in the light most favorable to the verdict, would
enable a reasonable jury to at least form differing conclusions about the
answer to question number one, that the evidence was more than a scintilla in
that regard, and that it was therefore legally sufficient to support the jury=s
answer.[20]  See Rocor Int=l, Inc., 77
S.W.3d at 262; Uniroyal Goodrich Tire Co., 977 S.W.2d at 334; see
also Dominguez v. Payne, 112 S.W.3d 866, 870 (Tex. App.CCorpus
Christi 2003, no pet.) (explaining that in determining questions based on the
alter ego theory, courts should take Aa
flexible fact‑specific approach@).  Thus, we overrule appellants= first
issue.

Issues two through four,
concerning jury question numbers two and three

 

Appellants= second
through fourth issues concern question numbers two and three of the jury charge,
which combined to give the jury an alternate way of holding Hyde-Way
responsible for Hyde=s assault if the jury answered Ano@ to
question number one of the charge. 
Because we have held that Hyde-Way=s
liability is sufficiently supported by the evidence related to question number
one of the charge, which directly asked if Hyde-Way should be responsible for
Hyde=s
conduct, we will not address whether its liability is supported by the
alternate theories outlined in question numbers two and three of the
charge.  See Tex. R. App. P. 47.1;
Hawkins v. Walker, 233 S.W.3d 380, 395 n.47 (Tex. App.CFort
Worth 2007, pet. denied).  Thus, we
overrule appellants= second through fourth issues.

 








                              The
Jury=s Findings on Damages

In their fifth through seventh issues, appellants
challenge various aspects of the jury=s
findings on damages that are contained in question numbers six through eight of
the jury charge.  Question number six of
the charge, which corresponds to appellants= fifth
issue, asked the jury, AWhat sum of money, if paid now
in cash, would fairly and reasonably compensate [Davis] for his injuries, if
any, that resulted from the occurrence in question?@  It then asked them to give an amount for six
different types of damages:

C       past
physical pain and mental anguish (the jury answered $30,000);

 

C       future
physical pain and mental anguish (the jury answered $0);

 

C       past
loss of earning capacity (the jury answered $3,100);

 

C       future
loss of earning capacity (the jury answered $5,406);

 

C       past
medical care expenses (the jury answered $6,764.90); and

 

C       future
medical care expenses (the jury answered $10,000).

 








Appellants contend that there is no evidence to
support the damages for past physical pain and mental anguish, past loss of
earning capacity, future loss of earning capacity, and future medical
expenses.  They also assert that Davis=s
petition does not support damages for future loss of earning capacity or for
future medical expenses and that Davis=s
recovery for past medical expenses in this case is barred by the doctrine of
collateral estoppel and the one satisfaction rule because Hyde compensated
Davis for his medical expenses as part of Hyde=s
criminal case.  Appellants do not claim
that the damages, although supportable in part, are merely excessive or that
they are not supported by factually sufficient evidence.

Standard of review

We apply the same no‑evidence standard of
review to legal sufficiency challenges to the evidence supporting a jury=s damage
awards as we do to a legal sufficiency challenge on a jury=s
liability findings.  Gen. Motors Corp.
v. Burry, 203 S.W.3d 514, 549 (Tex. App.CFort
Worth 2006, pet. denied) (op. on reh=g).

Issue five, concerning
jury question number six (on the components of economic and noneconomic
damages)

 

Past physical pain and mental anguish








Appellants in one paragraph argue that Davis Aliterally
offered no testimony whatsoever as to the dollar value of the physical pain and
mental anguish he had sustained prior to trial@ and
that because Davis had existing root canals before the assault, there were no
exposed nerves when Hyde broke Davis=s
teeth.  Appellants do not assert that
Davis did not have mental anguish after the assault.  As we have explained,

The process of awarding damages for amorphous, discretionary injuries
such as mental anguish or pain and suffering is inherently difficult because
the alleged injury is a subjective, unliquidated, nonpecuniary loss.  The presence or absence of pain, either
physical or mental, is an inherently subjective question.  No objective measures exist for analyzing
pain and suffering damages.  Once the
existence of some pain and suffering has been established, however, there is no
objective way to measure the adequacy of the amount awarded as compensation.

 








HCRA of Tex., Inc. v. Johnston, 178 S.W.3d 861, 871 (Tex. App.CFort
Worth 2005, no pet.) (citations omitted). 
Thus, because personal injury damages are Aunliquidated
and incapable of measurement by any certain standard, the jury has broad
discretion in fixing the amount of the award.@  Marvelli v. Alston, 100 S.W.3d 460,
482 (Tex. App.CFort Worth 2003, pet. denied).  Matters of Apast and
future physical pain, mental anguish, and physical impairment are particularly
within the jury=s province.  Therefore, as long as sufficient probative
evidence exists to support the jury=s
verdict, neither the reviewing court nor the trial court is entitled to
substitute its judgment for that of the jury.@  Id. (citation omitted); see J.
Wigglesworth Co. v. Peeples, 985 S.W.2d 659, 665B66 (Tex.
App.CFort
Worth 1999, pet. denied).  A plaintiff is
not required to testify about a specific amount of damages in order to obtain a
verdict for physical pain and mental anguish.[21]  See Baylor Med. Plaza Servs. Corp. v. Kidd,
834 S.W.2d 69, 78 (Tex. App.CTexarkana
1992, writ denied); see also Sw. Tex. Coors, Inc. v. Morales, 948 S.W.2d
948, 952 (Tex. App.CSan Antonio 1997, no writ)
(explaining that pain and suffering are Anot
subject to precise mathematical calculations@).

Although appellants are correct that there were
no exposed nerves when Hyde broke Davis=s teeth,
the record contains significant testimony and photographic evidence that
substantiates Davis=s physical pain.  For instance, Davis received a black eye from
Hyde=s punch
to his face, and he testified that he hurt Alike
hell@ as soon
as he was punched; he had broken blood vessels; the hospital gave him a
prescription for a AVicodin-type pain reliever@; when
at the dentist and periodontist, he was Asore@ and Auncomfortable@; and
for a few days after Hyde punched him, he could not chew food.








Thus, we cannot agree with appellants=
implication that Davis did not suffer from any pain.  Because there is more than a scintilla of
evidence to support the jury=s award
for Davis=s past pain and suffering, we
overrule that portion of appellants= fifth
issue.  See Uniroyal Goodrich Tire Co.,
977 S.W.2d at 334.

Past loss of earning capacity

Next, appellants contend that there is no
evidence to support the jury=s award
to Davis for his past loss of earning capacity and that Davis did not plead any
claim in his petition for that award. 
Davis asked for recovery for Alost
wages@ in his
petition.  The jury=s
verdict awarded $3,100 for Aloss of
earning capacity,@ but the trial court=s
judgment awarded that same amount for Apast
lost wages.@ 
Appellants acknowledge that Davis pleaded a claim for Alost
wages,@ but
they seem to argue (in one sentence and without citing any authority) that Aearning
capacity@ must be
treated differently than Awages.@[22]








To preserve a complaint for appellate review, a
party must have presented to the trial court a timely request, objection, or
motion that states the specific grounds for the desired ruling, if they are not
apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a).  If a party fails to do this, error is not
preserved, and the complaint is waived.  Bushell
v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).  The objecting party must get a ruling from
the trial court.  This ruling can be
either express or implied.  Frazier v.
Yu, 987 S.W.2d 607, 610 (Tex. App.CFort
Worth 1999, pet. denied).








To the extent that appellants contend that the judgment
is defective because it awards money for lost wages while the jury=s
verdict awards money for loss of earning capacity, appellants have not
preserved that contention because they did not file any motion to amend or
modify the judgment, did not address that alleged error in their motion for new
trial (which was filed before the judgment was signed), and did not otherwise
raise the issue in the trial court.  See
Tex. R. App. P. 33.1(a); Luna v. S. Pac. Transp. Co., 724 S.W.2d 383,
384 (Tex. 1987) (holding that a challenge on appeal to the apportionment of
damages in a judgment was waived by failing to object to the judgment in the
trial court); Dal‑Chrome Co. v. Brenntag Sw., Inc., 183 S.W.3d
133, 145 (Tex. App.CDallas 2006, no pet.); see
also Karenev v. Kareneva, No. 02‑06‑00269‑CV, 2008 WL
755285, at *7 (Tex. App.CFort Worth Mar. 20, 2008, no
pet.) (mem. op.) (holding that the appellant waived any error about the
characterization of child support awards by failing to file a post-judgment
motion such as a motion for new trial or a motion to amend or correct the
judgment).  And to the extent that appellants
argue that a question regarding Aloss of
earning capacity@ should not have been submitted
to the jury because Davis did not plead for such damages,  they waived that argument by failing to
object to the jury charge on that ground at trial.  See Tex. R. App. P. 33.1(a); Tex. R.
Civ. P. 274 (explaining that any complaint as to a jury charge question based
on Afault in
pleading@ is
waived unless specifically objected to); Equistar Chems., L.P. v. Dresser‑Rand
Co., 240 S.W.3d 864, 868 (Tex. 2007); see also McFarland v. Sanders,
932 S.W.2d 640, 647 (Tex. App.CTyler
1996, no writ) (holding that error regarding the failure of the jury charge to
conform to the pleadings was waived by the appellant=s
failure to object).

Finally, the record belies appellants=
complaint that Davis Aintroduced no evidence
whatsoever as to his lost wages in 2002.@  Davis testified that his dental treatment
caused him to take ten days=
vacation from work, which cost him Aa little
over $3,000.@ 
The jury awarded him $3,100; Davis=s
testimony provides more than a scintilla of evidence to support this
award.  Uniroyal Goodrich Tire Co.,
977 S.W.2d at 334.  For all of these
reasons, we overrule the past-loss-of-earning-capacity portion of appellants= fifth
issue.








Future loss of earning capacity

Appellants also assert that the jury charge=s
question on future loss of earning capacity is not supported by Davis=s
petition.  But again, appellants did not
raise an objection to the question on that basis at trial, so they waived any
related error.  See Tex. R. App.
P. 33.1(a); Tex. R. Civ. P. 274; Equistar Chems., L.P., 240 S.W.3d at
868.

Appellants also argue that there is Aabsolutely
no evidence whatsoever that [Davis] would sustain any >loss of
earning capacity= in the future.@  However, loss of future earning capacity
specifically includes the loss of future wages or income.  Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(10)(A).  Proof of future loss of earning capacity is
uncertain and must be left largely to the discretion of the jury.  Strauss v. Cont=l
Airlines, Inc., 67 S.W.3d 428, 435 n.1 (Tex. App.CHouston
[14th Dist.] 2002, no pet.).








Davis=s
dentist testified that the treatment Davis received is usually not a permanent
fix and that future treatment involving extractions or implants will likely be
required by both a dentist and periodontist. 
The jury could have reasonably inferred that Davis will be forced to
miss at least some more time from work to attend and recover from additional
medical procedures that are necessary because of Hyde=s
assault.  See City of Keller, 168
S.W.3d at 821B22; Lubbock County v. Strube,
953 S.W.2d 847, 856 (Tex. App.CAustin
1997, pet. denied) (op. on reh=g)
(holding that loss of earning capacity could be inferred from the evidence); Tri‑State
Motor Transit Co. v. Nicar, 765 S.W.2d 486, 493B94 (Tex.
App.CHouston
[14th Dist.] 1989, no writ) (holding that missed work in the future for further
treatment to an injury was compensable as a loss of earning capacity);
Mikell v. La Beth, 344 S.W.2d 702, 707 (Tex. Civ. App.CHouston
1961, writ ref=d n.r.e.) (allowing recovery for
time charged against sick leave as damages for loss of earning capacity).  Appellants have not challenged the specific
sum awarded for loss of future earning capacity by contending that the jury
unreasonably inferred that Davis will be absent from work for more time that
the procedures will actually require; their sole challenge is that there is no
evidence at all to support any of the sum awarded.  Thus, we also overrule the future earning
capacity portion of appellants= fifth
issue.

Past medical expenses








Appellants next assert that the jury=s
$6,764.90 award for past medical expenses is barred by the one satisfaction
rule and collateral estoppel because Hyde compensated Davis for his medical
expenses through restitution in Hyde=s
criminal case.  The record indicates that
as part of its judgment, the trial court in Hyde=s
criminal case ordered Hyde to pay Davis restitution in the amount of
$2,772.90.  Hyde paid the full
amount.  Davis argues that appellants
cannot prevail on this issue because they did not plead or prove the payment of
restitution as an affirmative defense.








We agree with Davis that appellants= claim
of restitution as a credit against the judgment is an affirmative defense that
appellants were required to plead in the trial court.  See Tex. R. Civ. P. 94, 95; Sage
St. Assocs. v. Northdale Constr. Co., 863 S.W.2d 438, 443B44 (Tex.
1993) (holding that indirect payment to a plaintiff as a credit against
recovery is an affirmative defense under rule of civil procedure 95); F‑Star
Socorro, L.P. v. City of El Paso, 281 S.W.3d 103, 107 (Tex. App.CEl Paso
2008, no pet.) (explaining that payment and offset through payment are
affirmative defenses); Columbia Med. Ctr. of Las Colinas v. Bush, 122
S.W.3d 835, 862 (Tex. App.CFort
Worth 2003, pet. denied) (holding that offset to past medical expenses is an
affirmative defense).  Texas courts have
specifically characterized the one satisfaction rule and the collateral
estoppel doctrine as affirmative defenses. 
See RenewData Corp. v. eMag Solutions, LLC, No. 03‑05‑00509‑CV,
2009 WL 1255583, at *1 n.1 (Tex. App.CAustin
May 6, 2009, pet. filed) (mem. op.); Domel v. City of Georgetown, 6
S.W.3d 349, 353 (Tex. App.CAustin
1999, pet. denied).  A defendant must
plead an affirmative defense in its answer, or it will waive the defense.  See Bush, 122 S.W.3d at 862; Sugar
Land Props., Inc. v. Becnel, 26 S.W.3d 113, 121 (Tex. App.CHouston
[1st Dist.] 2000, no pet.) (holding that under rule 95, the defendant waived
its affirmative defense to reduce a verdict because of payment of medical
expenses because it did not plead payment in its answer).

Appellants=
combined two-page answer at trial asserted only a general denial; it did not
assert any affirmative defenses.  When
appellants introduced evidence regarding Hyde=s
payment of restitution, the trial court granted Davis a running objection on
the basis that Hyde did not plead payment of the restitution.  Appellants did not seek any trial amendment
to plead payment of the restitution. 
Under these circumstances, considering the authority cited above, we
hold that appellants waived their defenses related to that payment.  Thus, we overrule the challenge in their
fifth issue to the jury=s award of past medical
expenses.

Future medical expenses








In the last part of their fifth issue, appellants
challenge the jury=s $10,000 award for future
medical expenses.  They argue that Davis
did not plead recovery for his future medical expenses and that there is no
evidence Aas to the nature and extent of
[Davis=s]
future medical care expenses in reasonable medical probability.@  Appellants did not object at trial to
submission of the future medical expenses question on the basis that Davis did
not plead for the expenses, so they have waived any error associated with that
contention.  See Tex. R. App. P.
33.1(a); Tex. R. Civ. P. 274; Equistar Chems., L.P., 240 S.W.3d at 868.

To recover for future medical expenses under
Texas law, the plaintiff must show that there is a Areasonable
probability@ (not a Areasonable
medical probability@) that
such expenses will be incurred.  Bush,
122 S.W.3d at 862B63; Furr=s, Inc.
v. Logan, 893 S.W.2d 187, 194 (Tex. App.CEl Paso
1995, no writ) (explaining that the jury may make its award Abased
upon the nature of plaintiff=s
injuries, medical care rendered before trial, and the plaintiff=s
condition at the time of trial@).  An award of future medical expenses lies
largely within the jury=s discretion, and no precise
evidence is required to support such an award. 
Bush, 122 S.W.3d at 863; see also Ibrahim v. Young, 253
S.W.3d 790, 808B09 (Tex. App.CEastland
2008, pet. denied) (ATo sustain an award of future
medical expenses, the claimant must present evidence to establish that, in all
reasonable probability, future medical care will be required and to establish
the reasonable cost of that care.@).  Also, because future medical expenses Aare, by
their very nature, uncertain, appellate courts are particularly reluctant to
disturb a jury=s award of these damages.@  Antonov v. Walters, 168 S.W.3d 901,
908 (Tex. App.CFort Worth 2005, pet. denied).








Here, after appellants stipulated that Davis=s
dentist was qualified to testify, the dentist explained that the treatment that
Davis had received was not usually a permanent fix.  Instead, the dentist testified that the
treatment Davis had received can be effective anywhere from five to fifteen
years (depending on the age of the patient and the patient=s
hygiene), and then the teeth must be extracted so that an oral surgeon or
dentist may place an implant or fixed bridge. 
The dentist explained that if the implants are done, the procedure would
cost A4,000 to
5,000 per tooth,@ and he said that Davis would
require the procedure for two teeth.  We
hold that, under the standards discussed above, this testimony comprised more
than a scintilla of evidence to support the jury=s
$10,000 award for future medical expenses. 
See Uniroyal Goodrich Tire Co., 977 S.W.2d at 334.  Thus, we overrule the final portion of
appellants= fifth issue.

Issues six and seven,
concerning jury question numbers seven and eight (on exemplary damages)

 

In their sixth and seventh issues, appellants
contest the jury=s $92,000 exemplary damage
award.  They contend in their sixth issue
that the evidence is legally insufficient to establish that Hyde acted with
malice while assaulting Davis, and they assert in their seventh issue that
Davis did not present any evidence about a sum of money that is appropriate for
exemplary damages.








Malice

Question number seven of the jury charge asked, ADo you
find by clear and convincing evidence that the injuries caused by [Hyde]
resulted from malice by Hyde?@  See Tex. Civ. Prac. & Rem. Code
Ann. '
41.003(a)(2) (Vernon 2008).  The trial
court instructed the jury of the definitions of Aclear
and convincing@ and Amalice@:

AClear and convincing@ means the measure or
degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.

 

AMalice@ means:

 

(A) a specific intent by [Hyde] to cause substantial injury to
[Davis]; or

 

(B) an act or omission by [Hyde]:

 

(1) which when viewed
objectively from the standpoint of [Hyde] at the time of its occurrence
involves an extreme degree of risk, concerning the probability and magnitude of
the potential harm to others; and

 

(2) of which [Hyde] has
actual, subjective awareness of the risk involved, but nevertheless proceeds
with conscious indifference to the rights, safety, or welfare of others.








See Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(2),
(7).[23]  Appellants contend in their legal sufficiency
challenge that Hyde=s assault was a Achildish
temper act where Hyde just exploded and nothing more.@[24]

In reviewing the evidence under a clear and
convincing standard for legal sufficiency, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that its finding was true.  Columbia
Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 248B49,
(Tex. 2008).  We must review all the
evidence in the light most favorable to the finding.  Id. at 248.








Exemplary damages are levied against a defendant
to punish the defendant for outrageous, malicious, or otherwise morally
culpable conduct.  Transp. Ins. Co. v.
Moriel, 879 S.W.2d 10, 16 (Tex. 1994) (op. on reh=g).  Thus, the fact that an act is wrong or
unlawful is not of itself a ground for an award of exemplary damages.  Cont=l Coffee
Prods. Co., 937 S.W.2d at 454.  In
determining the reprehensibility of a defendant=s
actions for the purpose of judging an award of exemplary damages, we consider
whether the harm caused was physical as opposed to economic, whether the
conduct indicates an indifference to or a reckless disregard for the health or
safety of others, whether the target of the conduct had financial vulnerability,
whether the conduct involved repeated actions or was an isolated incident, and
whether the harm was the result of intentional conduct or was a mere
accident.  Shear Cuts, Inc. v.
Littlejohn, 141 S.W.3d 264, 272 (Tex. App.CFort
Worth 2004, no pet.).

The clear and convincing evidence of malice may
be circumstantial.  See Nast v. State
Farm Fire & Cas. Co., 82 S.W.3d 114, 125 (Tex. App.CSan
Antonio 2002, no pet.).  As the Texarkana
Court of Appeals has explained,

Malice requires that the
defendant=s conduct involved an
objective extreme risk of harm and that the defendant had a subjective Aactual awareness@ of an extreme risk
created by the conduct. 
An objective extreme degree of risk is a risk Awhich is not a remote
possibility of injury or even a probability of minor harm, but rather the
likelihood of serious injury to the plaintiff.@  A subjective Aactual awareness@ requires evidence that
the defendant knew about the peril, but its acts or omissions demonstrated it
did not care.

Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss, 202
S.W.3d 427, 447 (Tex. App.CTexarkana
2006, no pet.) (citations omitted).  The
harm to be anticipated from the conduct must be extraordinary harm such as
death, grievous physical injury, or financial ruin.  Id.








Ill-will, evil motive, or spite between the
plaintiff and the defendant may be relevant as to whether the defendant acted
with malice.  See ONI, Inc. v. Swift,
990 S.W.2d 500, 503 (Tex. App.CAustin
1999, no pet.); Mo. Pac. R. Co. v. Lemon, 861 S.W.2d 501, 517 (Tex. App.CHouston
[14th Dist.] 1993, writ dism=d) (op.
on reh=g).  The criminal nature of the defendant=s act
may also be considered.  See C & D
Robotics, Inc. v. Mann, 47 S.W.3d 194, 201 (Tex. App.CTexarkana
2001, no pet.).

ASubstantial@ injury
is not defined by the exemplary damages statute.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 41.001.  However, the Texas Supreme Court (in a case
not related to exemplary damages) recently noted that the word Asubstantial@ Ahas two
basic components:  real vs. merely
perceived, and significant vs. trivial. 
These limitations leave a broad range of things covered.@  Barr v. City of Sinton, No. 06‑0074,
2009 WL 1712798, at *9 (Tex. June 19, 2009); see also In re C.M.C., 192
S.W.3d 866, 872 (Tex. App.CTexarkana
2006, no pet.) (defining Asubstantial@ as Aof ample
or considerable amount, quantity, size, etc.@).








The facts surrounding Hyde=s
assault on Davis reveal his ill-will and spite toward Davis.  For instance, a week before the assault
occurred, Hyde flagged Davis down in front of Davis=s house
to initiate a conversation in which, after first exchanging some other words
with Davis, Hyde said, AI=m sick
of you.  I=m sick
of that taxiway.  I=m going
to take everything you=ve got.  I=m going
to run your ass off the airport.  And
when I=m done
with you, your wife=s going to be giving blow jobs
to n----- on Rosedale.@ 
And immediately after the assault occurred, Hyde said, AThe next
time I see you, I=m going to kill you.@  Finally, appellants admit in their brief
that Hyde and Davis had ill-will toward each other; they state that the assault
Ais the culmination
of approximately three to four years when [Davis] and Hyde would not speak to
one another.@

Hyde=s act
was obviously intentional and criminal in nature; he was convicted for the
assault.[25]  Appellants did not present any evidence at
trial to attempt to justify Hyde=s act;
instead, the witnesses testified that Davis was trying to retreat when Hyde
punched him.  Also, the evidence
indicated that Hyde=s violence was not isolated; he
had threatened violence at the Airport on other occasions.  For example, in about 1991, while the owner
of an aircraft at the Airport was on a taxiway upon returning from an air show,
Hyde approached the aircraft in his truck and threatened the owner by leaving
the truck with a gun at his side.  Hyde
left after the aircraft=s owner called the police.








Finally, as described above through the evidence
of Davis=s
condition in the hours following the assault (including his pain suffered
because of his knocked out teeth and blackened eye) and the medical treatment
he required on the night of the assault and thereafter, Davis=s injury
from the assault was Asubstantial@; it was
Areal@ and Asignificant.@

We hold that under the standards given to the
jury in its charge and extrapolated by the authority cited above, there was at
least legally sufficient evidence to support the jury=s
affirmative answer to the trial court=s malice
question because the evidence allowed the jury to form a firm belief that Hyde
specifically intended to cause substantial injury to Davis.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 41.001(2),
(7); Hogue, 271 S.W.3d at 248B49.  Thus, we overrule appellants= sixth
issue.

Testimony about the amount of exemplary damages

In their seventh issue, appellants briefly
contend that the exemplary damage award must be reversed because the jury heard
Ano
evidence with regard to any sum appropriate@ for the
damages.

The decision on the amount of exemplary damages
is entrusted to the discretion of the jury. 
See Tex. Civ. Prac. & Rem. Code Ann. ' 41.010(b)
(Vernon 2008); Harris v. Archer, 134 S.W.3d 411, 436 (Tex. App.CAmarillo
2004, pet. denied) (op. on reh=g).  The amount is not susceptible to precise
calculation.  Tony Gullo Motors
I, L.P. v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006).








Specific testimony regarding a proper amount of
exemplary damages is not among the six statutory factors that jurors must
consider in awarding such damages.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 41.011(a)
(Vernon 2008).  Even among those six
factors, the absence of evidence about one of the factors does not render an
exemplary damages award invalid.  See Durban
v. Guajardo, 79 S.W.3d 198, 210B11 (Tex.
App.CDallas
2002, no pet.) (holding that evidence of the defendant=s net
worth, although a statutory factor for the recovery of exemplary damages, is
not a necessary element for such recovery). 
Finally, appellants have not cited any authority that requires a
plaintiff to present evidence regarding a specific amount of exemplary damages,
and we have not located any such authority.

For these reasons, we hold that Davis was not
required to present evidence about a specific amount of exemplary damages, and
we therefore overrule appellants= seventh
issue.

The Trial Court=s Ruling
on Appellants= Post-Trial Motion








In their eighth and final issue, appellants argue
that the trial court erred by failing to grant their post-trial motion for
judgment notwithstanding the verdict. 
But that motion raised essentially the same issues that appellants have
raised in this appeal, and in the briefing on their eighth issue, appellants
merely reiterate the arguments that they previously made on the issues resolved
above.  Thus, for the reasons that we
overruled appellants= previous seven issues, we also
overrule their eighth issue.[26]

Conclusion

Having overruled all of appellants= issues,
we affirm the trial court=s judgment.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, WALKER, and MEIER, JJ.

 

DELIVERED:  August 13, 2009











[1]See Tex. R. App. P. 47.4.





[2]At the time of the April
2008 trial, and for six to nine years preceding the trial, Candace owned all of
Hyde-Way=s stock.  No one has ever owned Hyde-Way stock other
than Hyde or Candace, and Hyde-Way has never had any full-time employees other
than those two individuals.





[3]The Northwest Regional
Airport is a small private airstrip that was previously owned by Hyde-Way and
is now owned by Texas Air Classics.  The
Airport has several hangars for small aircraft and aircraft-related businesses.  Texas Air Classics owns the runway, the main
taxiway, and some land; Hyde is Texas Air Classics= director and Candace is
its treasurer.  The Hydes also own other
various aviation-related corporations.





[4]Taxiways are paths that
allow aircraft to travel between their hangars and the runway.  Taxiways also act as streets for the Airport
that cars can use.  Hangar owners must
pay fees to use taxiways.  Texas Air
Classics owns and controls the Airport=s taxiways, and it receives the fees paid for the
taxiways= use; however, some
individuals make their taxiway payments to Hyde-Way.





[5]Davis paid Hyde directly
in 1990; he then paid annual checks to the Airport and then to the Airport
owners= association, although he
continued to deliver these checks to Hyde.





[6]The specific contents of
the April 7, 2004 conversation are included below in our discussion of the jury=s exemplary damages
award.  Before the April 7, 2004
encounter occurred, Hyde and Davis had not spoken since 1998.





[7]Hyde said to Davis, AYou got something to say
to me?@  Davis responded, AShort of >f--- you,= no.@





[8]Davis said that when he
said Af--- you@ to Hyde, Hyde Ajust
exploded. . . .  And he
jumped out of his truck, and he ran through the ditch.  And he=s got his fists up, and he=s going, >Come on, come on.  Right here.= . . .  And he sucker punched me with his left
[fist].@  Davis explained that the assault occurred
inside Davis=s fence line and that
Hyde hopped like a boxer before he hit Davis=s eye and then kicked him in the groin area.  Davis also testified that it was common on
Sunday evenings for Hyde to Apatrol the [A]irport when he=d get done at his office.@





[9]The court admitted these
pictures as exhibits at trial.





[10]The crown-lengthening
procedure involves removing gum tissue to expose teeth and then suturing gums
back around the teeth.





[11]The trial court admitted
copies of the bills and medical records related to Davis=s hospital stay and his
dental treatment.





[12]Only Davis remained in
the case at the time of the trial court=s judgment because his wife nonsuited her claims
on the day of trial.  Thus, in the
remainder of this opinion, we will refer only to Davis with regard to portions
of the case in which he and his wife jointly filed documents.





[13]Davis testified that he
stopped paying access fees for the taxiways once Athe dirt appeared.@





[14]Davis explained that his
hangar and the two lots around it remained for sale, Abut there=s no point in trying to
sell them.  There=s no way anyone will buy
them.@  He also said that he once had an offer on the
property, but after the potential buyer Awent to see Mr. Hyde, . . . when he came back, he
wanted out of the contract.@  He
stated, AWe=ve had two other serious
inquiries to the point where they were going to sign a contract; but they spoke
with Mr. Hyde first, and then they wouldn=t.@  Davis
asserts that Hyde wants to buy the property and that Hyde has taken actions to
force Davis to sell the property to him for a low price.  Davis said that his trouble with Hyde started
when Davis refused to sell his property to Hyde.





[15]As summary judgment
evidence, Davis included a copy of the verdict from Hyde=s criminal case and a
copy of our opinion affirming Hyde=s conviction. 
See Hyde v. State, No. 02‑04‑00349‑CR, 2005 WL
1838980, at *3 (Tex. App.CFort Worth Aug. 4, 2005,
no pet.) (not designated for publication).





[16]Hyde signed his name
here.





[17]The jury found against
Davis on his trespass claim; it determined that the assault did not occur on
Davis=s property.





[18]In appellants= brief, they argue that Athe jury [was] given
instructions which under [section 21.223] are prohibited.@





[19]It is unclear whether
Hyde=s transfer of his
Hyde-Way stock shares to Candace occurred before or after the assault.  The trial occurred in April 2008, the assault
occurred in April 2002, and Candace testified that the transfer occurred A[m]aybe six, seven,
eight, nine years ago.@





[20]We acknowledge that the
evidence, while legally sufficient, may not have preponderated toward holding
Hyde‑Way liable for Hyde=s assault under the theory in question number
one, as there was no evidence that Hyde used Hyde-Way to avoid obligations or
that he commingled his own property with Hyde-Way=s property.  However, neither Hyde‑Way nor Hyde has
raised factual sufficiency as a ground for reversal.





[21]Appellants do not cite
any authority that would require Davis to have testified to a specific dollar
amount of pain and mental anguish damages. 
We note that Davis did not specify any amount of damages in his
petition, and appellants did not file special exceptions to his petition.





[22]Some Texas courts have
equated the loss of past earning capacity to the loss of wages and have used
these terms interchangeably.  See McIver
v. Gloria, 140 Tex. 566, 569, 169 S.W.2d 710, 712 (1943) (signaling that
the loss of wages is a component of the loss of earning capacity); Bowler v.
Metro. Transit Auth. of Harris County, No. 01‑06‑00553‑CV,
2007 WL 1299803, at *3 (Tex. App.CHouston [1st Dist.] May 3, 2007, no pet.) (mem.
op.) (equating lost wages to lost earning capacity); City of San Antonio v.
Vela, 762 S.W.2d 314, 320 (Tex. App.CSan Antonio 1988, writ denied) (holding that
testimony regarding lost wages supported an award for lost earning capacity); see
also Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(10) (Vernon
2008) (including Awages@ as a component of Aloss of earnings@).





[23]The portion of the Amalice@ definition in subsection
(B) of the charge relates to the statutory standard used before the legislature
amended section 41.001(7) in 2003, after this lawsuit was filed, to delete that
subsection.  See BIC Pen Corp. v.
Carter, 251 S.W.3d 500, 509 & n.6 (Tex. 2008).





[24]Appellants do not cite
any legal authority in their discussion about the jury=s malice finding.





[25]Hyde admits in his brief
that he Aintentionally, knowingly,
struck [Davis] and caused bodily injury to [Davis].@





[26]We note that parties must
appeal from judgments, not from orders overruling their post-trial challenges
to those judgments.  See Puckett v.
Frizzell, 402 S.W.2d 148, 151 (Tex. 1966).